# MARYLAND SUPREME CORPORATION *v.* THE BLAKE COMPANY

[No. 144, September Term, 1976.]

*Decided March 1, 1977.*

532

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Daniel W. Moylan,* with whom were *William P. Nairn, Irving M. Einbinder* and *Byron, Moylan & Urner* on the brief, for appellant.

*John A. Latimer, Jr.,* and *John J. Dean,* with whom was *Evan Crossley* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Maryland Supreme Corporation (Supreme) sued Blake Company (Blake) in general assumpsit in the Circuit Court for Washington County claiming $6,000 damages. Blake filed a counterclaim against Supreme for $12,590.24 as damages for breach of contract. The court, sitting without a jury, found that Supreme owed Blake $6,590.24 and a judgment was entered under the counterclaim in favor of Blake against Supreme in that amount with costs. Supreme appealed to the Court of Special Appeals. We granted a writ of certiorari before decision by that court.

We are called upon to decide whether there was a contract for sale of goods between Supreme and Blake, and if there was, the extent to which it was enforceable.

I

The controversy stemmed from the construction of the Western Heights Middle School. In such a building project there are basically three parties involved: the letting party, who calls for bids on its job; the general contractor, who makes a bid on the whole project; and the subcontractors, who bid only on that portion of the whole job which involves the field of its specialty. The usual procedure is that when a project is announced, a subcontractor, on his own initiative or at the general contractor's request, prepares an estimate and submits a bid to one or more of the general contractors

interested in the project. The general contractor evaluates the bids made by the subcontractors in each field and uses them to compute its total bid to the letting party. After receiving bids from general contractors, the letting party ordinarily awards the contract to the lowest reputable bidder.[1]

## II

From the evidence adduced, it is manifest that the usual method of operation in the construction industry was followed in the construction of the Western Heights Middle School. The letting party, the Board of Education, advertised for bids for the construction of the School. Blake was one of the general contractors who responded. Supreme, a manufacturer of ready mixed concrete, learned through a trade journal what general contractors had bid on the job. After examining the specifications relating to concrete for the project, Supreme, as a subcontractor, wrote the interested general contractors with reference to supplying the concrete required. Its letter to Blake, dated 11 March 1975, read:

The Blake Company
P. O. Box 47
Hagerstown, Maryland 21740

Attention: Mr. Vernon Tetlow

Re: Western Heights Middle School

Dear Sirs:

We are pleased to submit a quotation on ready mix for the above mentioned project.

Please take note that the price will be guaranteed to hold throughout the job.

---

1. This analysis of the construction industry's method of operation is taken from *The "Firm Offer" Problem in Construction Bids and the Need for Promissory Estoppel,* 10 Wm. & Mary L. Rev. 212 (1968).

3,000 p.s.i. concrete $21.00 per yard, net

Hope that you are successful in your bid and that we may be favored with your valued order.

Yours very truly,

MARYLAND SUPREME
CORPORATION

/s/ Ben Wicklein
Sales Representative

Blake was the successful bidder. About 24 May 1975, fifty-nine days after the bids were opened, it was informed that it had been awarded the job as the general contractor. There was no written notification by Blake to Supreme that Supreme would supply the concrete. Vernon L. Tetlow, Blake's Engineering Manager, testified that he notified subcontractors "as soon as we get a contract that they are going to get one." He verbally notified Benjamin F. Wicklein, Supreme's salesman, that Supreme was to furnish the concrete for the job. " 'Ben' always asked me 'Are we good on that job? Are we going to furnish that job?' I said, 'Yes, give me a mix design.' Like we always do." That was the way he had notified Supreme on other jobs for which Supreme was to supply the concrete.

On 27 May a quality control engineer of Supreme wrote Blake, at Wicklein's request, submitting a concrete mix design and test data in order to obtain the approval of the concrete by the architect as required by the specifications. Wicklein said that he knew when the test data was submitted that Blake was the general contractor for the project. The specifications for the project included a provision that within forty-eight hours after the bids were opened the three lowest bidders must submit a list of subcontractors to the Board of Education. Thereafter, the successful bidder had to obtain the approval of the Board of Education before changing any subcontractor, and, in the case of concrete, new test data would have to be submitted and approved. In complying with the requirement to name its subcontractors, Blake gave Supreme as the supplier of

the concrete, and Supreme was so listed in the contract to build the School.

The Engineering Manager for Blake, Tetlow, explained why there was no formal written contract with Supreme. With some subcontractors, for example the electrical subcontractor, Blake "would furnish . . . a finite — to do all the electrical work complete for 'X' amount of dollars" and enter into a written contract. This cannot be done, said Tetlow, with suppliers of material like stone on the slab, rough lumber or concrete. There is never a written contract covering all the concrete to be furnished "[b]ecause there is no finite amount of money that I can write it for, because we are working with a variable on the quantity of the concrete that's going to be delivered; the same way with rough lumber or stone." He explained that you work it on "a neat yardage, but some would spill over, so I couldn't write a purchase order [to cover the entire job]." Therefore, according to Kenneth Lee Wilson, Supreme's Sales Manager, and Wicklein, the procedure in ordering concrete was that "the job superintendent would order what he needed for the next day either by calling our ready mix dispatcher for 10 yards or 20 yards or whatever" or, when Wicklein was on the job site, the superintendent would tell Wicklein.

For a time all went well. Supreme began delivering concrete to the job on 11 July 1975, and it is obvious that the procedure outlined by Wilson and Wicklein was followed. As shown by Supreme's ledger sheets listing invoices to Blake, deliveries were made a number of times a day on various days to supply the concrete to be poured from time to time.[2] Supreme billed Blake at the rate of $21 per yard in accordance with its letter of 11 March 1975, and the parties were apparently content.

Trouble brewed in late October. On 24 October 1975 Supreme wrote Blake: "Due to numerous increases in the cost of cement and other raw materials absorbed by our company since our last increase, we are forced to raise our

---

**2.** Through 29 October 1975 some 132 deliveries of various amounts of concrete were made covering about 13 days. Each delivery was represented by a separate invoice.

ready mix prices effective November 1, 1975 . . . . We regret we are unable to give any protection on jobs in progress." The price of the kind of concrete required for the School was increased to $27 per yard. The letter was signed for Supreme by its Sales Manager, and he testified that it was a form letter sent to all of Supreme's customers. Blake responded. Under date of 12 November 1975, its Engineering Manager wrote Supreme:

> I have received your form letter dated October 24, 1975. I assumed then and will continue to assume that this was meant for projects that you have not made a commitment and not, therefore, Western Heights Middle School for which the concrete price is guaranteed for the project duration.
>
> If this is incorrect, correspond directly by letter to our office that you intend to default your contract.

As a result of the letter of 12 November, Russell R. Reed, Jr., President of Supreme, called on M. William Dutton, Jr., President of Blake "to further amplify the fact that we were forced to raise our prices and to indicate to him that we would be most delighted to deliver concrete to the . . . School at the price of $27.00." Dutton testified that Reed explained to him the necessity for the increase in price, intimating that otherwise Supreme might have to discontinue business. Dutton told Reed that Blake could not accept the increase "because we had bid the job on firm prices." With 2000 to 2500 yards of concrete yet to pour, the $6 per yard increase represented a considerable amount, and there was talk "in the field" that the price "might even go to $29.00." During Reed's testimony, the court asked him: "[W]hen you raised the prices, was it that you felt . . . there was no guarantee or that under the law you were advised that you could any way?" Reed replied: "Our increase, it wasn't because of any legal inquiry that we had made, sir, we just had high costs and we raised the prices." He added: "And, we felt like there was no contractual obligation in a long term on this project." On cross-examination, however, he was referred to the letter

of 11 March 1975 to Blake from Wicklein, who, Reed conceded, was authorized to "quote projects," which quoted the price of $21 per yard. Pointing out that the letter said that the price was "guaranteed to hold throughout the job," counsel for Blake asked: "Now, Mr. Reed, you've been in this business and you've dealt with the Blake Company for a number of years on many projects, what does that mean to you?" Reed replied: "It would normally mean that you would do it for the whole job."

As of 1 November 1975, Supreme charged Blake $27 a yard for concrete delivered to the job. Supreme's last delivery was on 13 November. Blake purchased concrete thereafter from two other firms. The evidence is undisputed, however, that it could do so only upon first obtaining the approval of the architect for the Board of Education after submitting new test data on the concrete to be so purchased. Blake received the necessary approval. Even though the concrete to finish the job was purchased at the lowest price obtainable, it cost Blake $12,590.24 more than it would have cost at the original price of $21 a yard. Blake withheld $6,000 from the amount Supreme claimed was due for the concrete which it delivered.

### III

Supreme advances four contentions on appeal:

(1) There was no offer made by Supreme.

(2) Assuming there was an offer, there was no acceptance by Blake.

(3) Assuming there was an offer and an acceptance, there was no valid contract.

(4) Assuming there was a valid contract, it was only partially enforceable.

### The Offer

It is manifest that what was involved here was a sale of goods within the contemplation of the Maryland Uniform Commercial Code — Sales (hereinafter cited as UCC) Maryland Code (1975), Commercial Law, Title 2. "Offer,"

however, is not defined in the UCC, and with respect to it we look to the common law and the law merchant. UCC § 1-103.

"An essential feature of every contract is the parties' mutual assent . . . ." *Peer v. First Fed. S. & L. Ass'n,* 273 Md. 610, 614, 331 A. 2d 299 (1975). Thus, it is usually necessary for one of the parties to propose to the other a promise which he will make for a certain consideration, or to state the consideration which he will give for a certain promise. The promise is an offer. "An offer necessarily looks to the future. It is an expression by the offeror of his agreement that something over which he at least assumes to have control shall be done or happen or shall not be done or happen if the conditions stated in the offer are complied with. Unless the statement gives to the person to whom it is addressed an assurance that, on some contingency at least, he shall have something, the statement is not an offer." *Williston on Contracts,* § 24A (3rd ed. Jaeger 1957) (hereinafter cited as *Williston).* So, an offer is always a conditional promise and it may become a contract. It is distinguished from other conditional promises "only because the performance of the condition in an offer is requested as the agreed exchange or return for the promise or its performance, thereby giving the offeree a power, by complying with the request, to turn the promise in the offer into a contract of sale." *Williston,* § 25.

An offer must be definite and certain. *Peoples Drug Stores v. Fenton,* 191 Md. 489, 494, 62 A. 2d 273 (1948). To be capable of being converted into a contract of sale by an acceptance, it must be made under circumstances evidencing an express or implied intention that its acceptance shall constitute a binding contract. Accordingly, a mere expression of intention to do an act is not an offer to do it, and a general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer. Thus, a mere quotation or a statement of a price or prices and an invitation to enter into negotiations, are not offers which may be turned into binding contracts upon acceptance. Such proposals may be merely suggestions to induce offers by others. *See Williston,*

§§ 31-33; 17 Am. Jur. 2d, *Contracts* §§ 31-33 (1964); 67 Am. Jur. 2d, *Sales* §§ 73-75 (1973). What this all boils down to is expressed in 17 Am. Jur. 2d, *Contracts* § 33 (1964):

> From the nature of the subject, the question whether certain acts of conduct constitute a definite proposal upon which a binding contract may be predicated without any further action on the part of the person from whom it proceeds, or a mere preliminary step which is not susceptible, without further action by such party, of being converted into a binding contract, depends upon the nature of the particular acts or conduct in question and the circumstances attending the transaction. It is impossible to formulate a general principle or criterion for its determination.

Therefore, in its final determination, the question of whether an offer was made seems to be one dependent on the intention of the parties, and, being such, it depends on the facts and circumstances of the particular case. The UCC changes none of these principles of law. 67 Am. Jur. 2d, *Sales* § 74 (1973).

Supreme's proposal was evidenced by its letter of 11 March 1975 to Blake. Supreme would now have it be merely a price quotation, and claims that did not contain many of the essential terms of an offer "such as the quality and quantity of the product to be supplied, the number and dates of the deliveries, the terms of payment, the costs of shipment and the time for performance." We do not agree. Considered in light of the facts and circumstances, the trial court could have found, as it obviously did, that the letter of 11 March 1975 constituted a definite and certain offer with the intent that, if accepted, it would result in a contract. By the letter, Supreme proposed to furnish Blake with ready mix 3000 p.s.i. concrete at $21 per yard, net, in such quantity as Blake required for the Western Heights Middle School project. The language in the letter stating the quotation was "on ready mix for *the above mentioned project* [Western Heights Middle School]," and asserting that "the price will

be guaranteed to hold *throughout the job"* (emphasis supplied) may be considered as measuring the quantity of the concrete by the requirements of the buyer, as recognized in UCC § 2-306 (1). The contingency was that Blake be the successful bidder. If Blake were awarded the general contract for the construction of the School and accepted Supreme's offer, there would be a binding contract. When viewed with reference to the method of operation of the construction industry and the prior course of dealings between Supreme and Blake, it is manifest that Supreme's letter was no mere price quotation or invitation to negotiate. It gave Blake the assurance that if Blake were the general contractor on the School project Blake could obtain from Supreme the concrete necessary for the job at $21 per yard. Thus, it was an offer, and the trial court did not err in so considering it.

## The Acceptance

The mutual assent which is the essential feature of every contract is crystallized when there is a knowing and sufficient acceptance to a certain and definite offer. *Peer v. First Fed. S. & L. Ass'n, supra,* 273 Md. at 614. Supreme urges that even if it made a certain and definite offer, there was no valid acceptance by Blake so as to give rise to a binding contract. It puts the issue in the context of Maryland Rule 886 and asserts that the judgment of the lower court on the evidence that there was an acceptance was clearly erroneous and should be set aside. We have no difficulty in determining that the lower court was not clearly wrong in ruling that Blake accepted Supreme's offer.

As we have indicated, what is involved here is the sale of goods within the contemplation of the UCC. We start, therefore, with the basic principles that the contract may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract, and that an agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined. UCC § 2-204 (1) and (2). The Official Comment to subsection (1) states that

"appropriate conduct by the parties may be sufficient to establish an agreement." We also note that unless otherwise unambiguously indicated by language or circumstances, "[a]n offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." UCC § 2-206 (1) (a). The Official Comment to § 2-206 observes:

> Any reasonable manner of acceptance is intended to be regarded as available unless the offeror has made quite clear that it will not be acceptable. Former technical rules as to acceptance ... are rejected and a criterion that the acceptance be "in any manner and by any medium reasonable under the circumstances," is substituted.

The trial court found as a fact that Blake "promptly notified Supreme of its successful bid, and verbally accepted Supreme's offer," that Blake "began ordering as concrete was needed, and continued to do so until it received a letter from Supreme dated October 24, 1975 [raising the price]," and that "Supreme and Blake had several times done business before, and ... that the procedure in this case was as it had always been before." There was credible evidence to support these findings. Applying the applicable statutory provisions of the UCC to these facts leads to the conclusion that the verbal acceptance by Blake of Supreme's offer was reasonable in the circumstances, that Blake did so accept it, and that the conduct of the parties, particularly that of Supreme in delivering concrete and that of Blake in accepting and paying for it, recognized the existence of a contract. There being legally sufficient evidence for the court as the trier of fact to find that Blake accepted Supreme's offer, that judgment on the evidence was not clearly erroneous. *Delmarva Drill Co. v. Tuckahoe*, 268 Md. 417, 424, 302 A. 2d 37 (1973); *Knowles v. Binford*, 268 Md. 2, 10-12, 298 A. 2d 862 (1973).

## The Contract

Supreme declares that, even assuming that there was an offer by Supreme and an acceptance by Blake, the trial court

was wrong in concluding that there was a binding contract between Supreme and Blake. Supreme's point is that there was "a lack of mutuality of obligation." It now characterizes Blake's obligation under the contract created from the acceptance of Supreme's offer of 11 March 1975 as "an illusory promise." It claims: "Blake was not obligated to utilize Supreme as its exclusive supplier of concrete in the Western Heights Middle School project. Indeed, it was not obligated to purchase any of the concrete from Supreme." We do not see it that way.

We look again to the UCC. Section 2-301 provides: "The obligation of the seller is to transfer and deliver and that of the buyer to accept and pay in accordance with the contract." The Official Comment explains: "In order to determine what is 'in accordance with the contract' . . . usage of trade, course of dealing and performance, and the general background of circumstances must be given due consideration in conjunction with the lay meaning of the words used to define the scope of the conditions and duties." [3] UCC § 2-208 (1) provides:

> Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

The Official Comment observes that "[t]he parties themselves know best what they meant by their words of agreement and their action under that agreement is the best

3. UCC § 1-205 (1) defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Subsection (3) provides that "[a] course of dealing between parties . . . give[s] terms of an agreement." The Official Comment states that "course of dealing may enter the agreement either by explicit provisions of the agreement or by tacit recognition. Although under subsection (1) it is restricted, literally, to a sequence of conduct between the parties previous to the agreement, according to the Official Comment, the provisions of § 2-208 make it clear that a sequence of conduct after or under an agreement may have equivalent meaning.

indication of what that meaning was. . . . Under this section a course of performance is always relevant to determine the meaning of the agreement." See UCC § 2-202 which includes that even a final written expression of the agreement may be explained or supplemented by course of dealing or by course of performance. Finally, UCC § 2-204 (3) declares:

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

There being an offer and acceptance which gave rise to a contract, it was, pursuant to UCC § 2-301, the obligation of Supreme to transfer and deliver the concrete and that of Blake to accept and pay for the concrete "in accordance with the contract." The key is what was "in accordance with the contract." We think that the trial court could properly determine that (in accordance with the contract here) Supreme was obligated to sell and deliver to Blake, and Blake was obligated to accept from Supreme, at the price of $21 per yard, all the concrete required in the construction of the Western Heights Middle School under Blake's contract with the Board of Education. The court could reach this determination by considering, pursuant to the applicable provisions of the UCC, the general background of circumstances, the terms of the offer accepted, the course of dealing between the parties, and the course of performance by them.

The general background of circumstances was that the transaction was between a general contractor and a subcontractor. The evidence showed that both had been in business a number of years, and it is a rational inference that they were thoroughly experienced in their respective areas and well familiar with the method of operation of the construction industry. There was no intimation of importuning, coercion, duress or undue adhesion. Supreme sought the sale on its own initiative and succeeded in obtaining it on the terms it proposed.

The offer by Supreme submitted a price on concrete "for the above mentioned project," that is the Western Heights Middle School and guaranteed the price to hold "throughout the job." Although it did not in precise words specify that it was to supply all the concrete, that implication was surely there. But even if it be deemed that the offer did not expressly call for Supreme to furnish all of the concrete, the lack of that term, as we have indicated, did not render the resulting contract fatally defective.

The course of dealing between the parties showed that they contemplated that Supreme was to furnish all the concrete. There was evidence that the procedure here followed with respect to the sale of concrete by Supreme to Blake was the same as that which they had followed on prior jobs. There was evidence that Wicklein, Supreme's salesman, would always ask Blake's Engineering Manager: "Are we good on *that job* Are we going *to furnish that job*? " (emphasis supplied). The Engineering Manager would always reply to the effect: "Yes, give me a mix design." The architect when asked if there were two concrete suppliers on other Board of Education projects, said that he only had knowledge of his firm's jobs with the Board and as to those, he did not recall any in which there was more than one concrete supplier. In short, there was indication that in the course of dealing between Blake and Supreme when Supreme was the subcontractor selling the concrete to Blake as the general contractor, Supreme furnished all the concrete required for the project.

With respect to the course of performance, Blake, complying with the specifications to submit to the Board of Education a list of subcontractors, gave Supreme as the subcontractor to supply the concrete. It is a rational inference that Blake construed the contract to call for Supreme to be the concrete subcontractor for the whole job. Supreme was the only concrete manufacturer Blake submitted. Blake was not free to purchase concrete from another supplier without first obtaining the approval of the Board of Education upon the submission of new test data. Even more significant is that until Blake deemed the

contract breached, it called only upon Supreme to furnish the concrete, and until Supreme raised the price, it, in fact, was the sole supplier of concrete for the project. Blake made its needs known from day to day, and Supreme filled the orders, making some 132 deliveries in four months.

We conclude that the trial court could have properly found that there was mutuality of obligation "in accordance with the contract." It, therefore, did not err in ruling that there was a binding contract.[4]

### The Statute of Frauds

Supreme contends: "Blake cannot enforce a contract with Supreme beyond the amount of concrete actually accepted and paid for because Blake has failed to produce a memorandum of any such purported contract sufficient to satisfy the Statute of Frauds."

The "Statute of Frauds" to which Supreme refers is that set out in UCC § 2-201. It covers contracts for the sale of goods for the price of $500 or more.[5] Patently, therefore, the contract between Supreme and Blake was subject to its provisions. It declares, with designated exceptions, such contracts to be unenforceable by way of action or defense

---

4. We have resolved the case *sub judice* under the Maryland Uniform Commercial Code — Sales because the transaction was for a sale of goods. A question as to what status the bid between the subcontractor and the general contractor occupies may also arise when the subcontract involves goods and services in circumstances that the UCC would not apply. *See The "Firm Offer" Problem in Construction Bids and the Need for Promissory Estoppel,* 10 Wm. & Mary L. Rev. 212, 213 (1968), and Schultz, *The Firm Offer Puzzle: a Study of Business Practice in the Construction Industry,* 19 U. Ch. L. Rev. 237 (1952).

5. The original Statute of Frauds, 29 Chas. Cap. 3 became effective in Maryland in 1677, and, except for statutory modifications in regard to the sale of goods, has remained in its original form in this State since its effective date. Its provisions were continued in Maryland after the American Revolution by virtue of the provisions of the Constitution of 1776 and subsequent constitutions. *See* Constitution of Maryland, 1867, Declaration of Rights, Article 5. The Seventeenth Section of the Statute of Frauds, concerned with the sale of goods, wares and merchandise of the value of five pounds sterling and upwards, provided by its terms that part payment or part delivery would remove the transaction from the provisions of the statute. The Seventeenth Section was thereafter modified by the Uniform Sales Act and the Uniform Commercial Code. Kline v. Lightman, 243 Md. 460, 470-472, 221 A. 2d 675 (1966). Today, the provisions of UCC § 2-201, as now in effect, are controlling with respect to the requirements of a writing for the sale of goods.

unless there is some writing sufficient to indicate that a contract of sale has been made between the parties and signed by the party against whom enforcement is sought. One of the exceptions is with respect to goods for which payment has been made and accepted or which have been received and accepted. UCC § 2-201 (3) (c). Thus, as Supreme recognizes, the contract was enforceable, in any event, with respect to the concrete which Blake received and accepted. The question is whether the contract was enforceable as to the balance of the concrete required for the project so that Supreme would be liable for the loss to Blake resulting from the breach.

Supreme argues that there was no writing signed by it sufficient to satisfy the statute and that none of the exceptions, other than that as to goods received and accepted, applied to take the contract out of the statute. Blake claims that the statute was satisfied and that even if it were not, Supreme was precluded from its operation by the doctrine of equitable estoppel.

In finding that "Blake accepted the offer and that a binding contract was made," the lower court in its memorandum opinion did not touch on the question of the Statute of Frauds. According to the court, Supreme's contentions were "(1) The offer was never accepted (2) The contract was *void* because it was in violation of the Commercial Code." (emphasis supplied). The only reference to the UCC in the court's memorandum was to § 2-205 concerning "firm offers" which the court found was inapplicable because of the acceptance of the offer. The transcript of the proceedings gives no indication that the issue of the Statute of Frauds was presented to the trial court, and arguments of counsel were not transcribed. At the close of all the evidence the court instructed counsel "to submit briefs within a week." They were not transmitted to us with the record. We do not know whether the issue of the Statute of Frauds was presented to the lower court and, ordinarily we would not decide any point which did not plainly appear by the record to have been tried and decided by the trial court. Maryland Rule 885. Blake, however, does

not suggest in its brief that the point was not raised below but answers it on the merits.

As issues of fact are involved, it appears to us that the purposes of justice will be advanced by permitting further proceedings in the cause pursuant to Maryland Rule 871. We order the case remanded to the Circuit Court for Washington County for further proceedings as if no appeal had been taken and the judgment from which the appeal was taken had not been entered. Upon remand, the lower court shall conduct further proceedings. It shall, by the introduction of additional evidence or otherwise as may be necessary to make factual findings and reach conclusions, of law, determine:

(1)

Whether Supreme waived the defense provided by UCC § 2-201 by failing to raise it properly below.

> See *Grauel v. Rohe*, 185 Md. 121, 124, 43 A. 2d 201 (1945); *Double-E Sportswear Corp. v. Girard Trust Bank*, 488 F. 2d 292 (3rd Cir. 1973).

(2)

If such defense was not waived, whether the contract between Supreme and Blake was unenforceable under UCC § 2-201 except to the concrete received and accepted by Blake under the contract.

> As to sufficiency of writing, *see Alaska Ind. Fish. Mkg. Ass'n v. New England Fish Co.*, 548 P. 2d 348 (Wash. 1976); *Alice v. Robett Mfg. Co., Inc.*, 328 F. Supp. 1377 (N.D. Ga. 1970) *aff'd*, 445 F. 2d 316 (5th Cir. 1971); *Southwest Eng. Co., Inc. v. Martin Tractor Co., Inc.*, 473 P. 2d 18 (Kan. 1970).
>
> As to the quantity of goods, *see Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F. 2d

784 (5th Cir. 1975); *Fortune Furniture Co., Inc. v. Mid-South Plastic Co., Inc.*, 310 So. 2d 725 (Miss. 1975); *Port City Const. Co., Inc. v. Henderson*, 266 So. 2d 896 (Ala. 1972); *Hankins v. American Pac. Sales Corp.*, 499 P. 2d 214 (Wash. 1972).

As to confirmation of contract, *see Ace Concrete Products Co. v. Rodgers Const. Co.*, 245 N.W.2d 353 (Mich. 1976); *Doral Hosiery Corp. v. Sav-A-Stop, Inc.*, 377 F. Supp. 387 (E.D. Pa. 1974); *Fort Hill Lumber Co. v. Georgia-Pacific Corp.*, 493 P. 2d 1366 (Or. 1972); *Azevedo v. Minister*, 471 P. 2d 661 (Nevada 1970); *Reich v. Helen Harper, Inc.*, 3 UCC Rep. 1048 (Civ. Ct. N.Y.C. 1966).

As to admission of existence of contract, *see Reissman International Corp. v. J. S. O. Wood Products, Inc.*, 10 UCC Rep. 1165 (N.Y. Civ. Ct. 1972).

As to part performance, *see In re Augustin Bros. Co.*, 460 F. 2d 376 (8th Cir. 1972).

Generally, *see J. White & R. Summers, Uniform Commercial Code* (West 1972) § 2-1 through § 2-5; R. Anderson, *Uniform Commercial Code* (2d ed. 1972) § 2-201: 1-2-201: 53; A. Squillante & J. Fonseca, 2 *Williston on Sales* (4th ed. 1974) § 14-1 through § 14-9.

(3)

If the contract was unenforceable under UCC § 2-201, whether Supreme was precluded by the doctrine of equitable estoppel from asserting the statute.

*See Dahl v. Brunswick Corp.*, 277 Md. 471, 487, 356 A. 2d 221 (1976); *Kline v.*

*Lightman,* 243 Md. 460, 474-475, 221 A. 2d 675 (1966); *Dangerfield v. Markel,* 222 N.W.2d 373 (N.D. 1974); J. White & R. Summers, *Uniform Commercial Code* (West 1972) § 2-6; Note, *Statute of Frauds — The Doctrine of Estoppel and the Statute of Frauds,* 10 Mich. L. Rev. 170 (1967); Comment, *Equitable Estoppel and the Statutes of Frauds in California,* 53 Cal. L. Rev. 590 (1965).

We observe that this opinion is conclusive as to the points finally decided herein.

*Case remanded for further proceedings in accordance with this opinion; costs to abide the result.*