ENVIRONMENTAL ELEMENTS
CORPORATION

v.

MAYER POLLOCK STEEL
CORPORATION.

Civ. No. T–77–1669.

United States District Court,
D. Maryland.

Jan. 21, 1980.

David F. Albright, Christopher R. West and Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff.

William H. Holden, Jr., Donn Weinberg and Weinberg & Green, Baltimore, Md., for defendant.

THOMSEN, Senior District Judge.

This diversity action, tried before the court without a jury, arises out of a subcontract between Environmental Elements Corporation (plaintiff or EEC), a subsidiary of Koppers Company, and Mayer Pollock Steel Corporation (defendant or MP), in which defendant agreed to purchase the material for and to fabricate and paint four large bayline columns, to be installed by plaintiff in a structure known as a "precipitator" which plaintiff had contracted to erect and did erect for American Electric Power Company (AEP) in West Virginia. The columns contained 96 flange welds and 60 web welds. The welding was done by defendant at its plant in Pennsylvania; the columns were accepted there by plaintiff and were sent to the work site in West Virginia; however, after the columns were installed in the precipitator it was discovered that all or almost all of the 156 welds were defective, and that the welding would have to be redone in the precipitator, which was a costly operation. Plaintiff seeks to recover from defendant the cost of examining the welds and rewelding the defective welds.

Diversity jurisdiction exists and is not disputed. Plaintiff's principal office is in Maryland; defendant's plant is in Pennsylvania. Those states have enacted the Uniform Commercial Code (UCC), as has West Virginia.

Plaintiff alleged, in the first count of its complaint, that defendant breached the subcontract in question in several ways:

(1) that defendant's welders were not qualified for unlimited thickness welding, as required by the contract;

(2) that defendant failed to fabricate the bayline columns in accordance with the drawings;

(3) that defendant's welding was defective in workmanship;

(4) that defendant's welding failed to comply with the practices set forth by the American Welding Society in its Structural Welding Code (SWC), as required by the contract; and

(5) that defendant failed to comply with its responsibility to perform appropriate quality control.

Defendant denied those allegations, but before final argument on the law the court heard argument on the facts and found that plaintiff had proved all the alleged breaches

set out above, except (1).[1] Defendant, therefore, has relied heavily upon its contentions:

(A) that plaintiff itself had responsibilities under SWC to exercise quality control over the welding, which plaintiff failed to do; and

(B) that plaintiff failed to give notice of breach to defendant within a reasonable time after it should have discovered such breach or breaches.

Defendant argues that the failures on plaintiff's part relieve defendant from any liability under the contract.

Plaintiff's second count alleged that on October 21, 1976, after the discovery that the welds would have to be repaired, defendant entered into an agreement providing that defendant would pay for the entire cost of rewelding defendant's welds on the four bayline columns, all of which had been installed in the precipitator at the job site in West Virginia; that pursuant to this agreement plaintiff performed the necessary rewelding of the welds, and billed defendant for the costs thereof, which defendant refused to pay.

Defendant denies that the agreement alleged in the second count was made. Defendant concedes, however, that after the defects were discovered and reported by plaintiff to defendant, but before the repair work was begun, defendant's vice–president (Raker) had discussed the matter with plaintiff's purchasing officer and other representatives of plaintiff in Baltimore, and had offered to participate, to an unspecified extent, in the costs of replacing the MP welds which required replacement, but defendant argues that no amount was ever agreed upon.

At the trial each side called witnesses and offered depositions and exhibits, some many pages in length.

At the conclusion of the evidence each side presented proposed findings of fact. In accordance with a practice of this court, each side marked its opponent's proposed findings: blue for those findings or portions thereof which are admitted, red for those which are disputed, and yellow for those which are conceded to be true but considered immaterial. After full argument on the facts the court wrote "found," "not found" or "found as modified" on each proposed finding, and filed with the clerk as part of the record in this case the proposed findings and the court's ruling on each. Thereafter, both sides filed briefs, and oral argument on the law as applied to the facts has been heard.

Because of the detailed findings, it is not necessary to set out the facts at length in this opinion. It should be noted that this is not a tort action for negligence, but is an action in contract based upon (I) the original subcontract between the parties hereto, and (II) the alleged agreement between plaintiff's representatives and Raker, defendant's vice president, at the meeting in Baltimore on October 21, 1976.

I

As stated above, in the third and fourth paragraphs of this opinion, the facts found by the court support nos. (2), (3), (4) and (5) of the allegations of breach of contract contained in plaintiff's first count.

(a)

The first defense advanced by defendant thereto is that "plaintiff failed to give notice of breach to defendant within a reasonable time after it [plaintiff] should have

---

1. The allegations in plaintiff's first count are supported by the following findings of fact, inter alia:

Defendant failed to fabricate the bayline columns in accordance with the drawings–
Plaintiff's 4, 26, 27, 31, 34, 35, 41.
Defendant's work was defective in workmanship–
Plaintiff's 6, 27, 31, 33, 34, 37.
Defendant failed to comply with the SWC–

Plaintiff's 5, 19, 34, 37, 38, 41.
Defendant failed to perform appropriate quality control–
Plaintiff's 5, 31, 33, 42, 44.
Defendant's 5.
Many other findings of fact proposed by plaintiff and defendant respectively have been considered by the court in connection with these and other issues in the case.

discovered such breach and is therefore barred from any remedy." This defense is based upon UCC § 2–607(3)(a). That subsection provides:

> (3) Where a tender has been accepted
>
> (a) The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;
> . . .

Section 1–204(2) states: "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."

■ Whether notice of breach has been given within a reasonable time is ordinarily a question of fact based upon all the surrounding circumstances. *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 327 A.2d 502 (1974); *Smith v. Butler*, 19 Md.App. 467, 311 A.2d 813 (1973).[2] Where the facts are undisputed and but one inference can be drawn therefrom as to the reasonableness of the notice, the question is one of law. *Id.*

The evidence shows that in mid–December 1975, after receiving an inspection release form from plaintiff, defendant shipped the bayline columns to plaintiff at the job site (the AEP plant then being constructed in West Virginia), where they were accepted by plaintiff. The work on the AEP plant had not then progressed to a point where the bayline columns were to be installed in the precipitator structure; such installation began in the early spring of 1976. In July 1976, for some reason not shown by the evidence in this case, plaintiff had ultrasonic testing performed at the job site on some welds made by subcontractors other than defendant, which revealed that some of the tested welds were defective in quality.

Plaintiff first learned of problems with defendant's welds in September 1976, and on September 30 informed defendant that AEP claimed that there were defects in defendant's welding work. The court finds and concludes that notice of the claimed defects was given within a reasonable time after plaintiff discovered the possibility of such defects.

Defendant argues, however, that plaintiff *should* have discovered the breach at or near the time of acceptance, and that the delay in notification was unreasonable and bars plaintiff's recovery under UCC § 2–607(3)(a). The evidence shows that Lerp, an employee of defendant, visually inspected the finished columns at defendant's plant before they were released for shipment to West Virginia. At that time only the external surfaces of the welds were visible, and they were covered by a layer of paint. The contract did not require plaintiff to engage in any testing (destructive or non–destructive) of the welds before or after acceptance. The witnesses for both sides agreed that, after a weld has been completed, it is impossible to tell through a visual inspection whether back–gouging[3] required by the contract has been done. Defendant's failure adequately to perform the root back–gouging was the major cause of defects in its welds. Whether plaintiff herein "should have discovered" the defects in the welds at or around the time of acceptance (December 1975) turns on the question whether plaintiff had a legal duty to test for and discover any latent defects in the welds not discoverable by a visual inspection.[4]

Most of the cases cited by defendant on this point dealt with facts quite different

**2.** Both sides have relied primarily on Maryland cases in their arguments.

**3.** That term is defined in Appendix I B of SWC as follows:

> *Back Gouging:* The forming of a bevel or groove on the other side of a partially welded joint to assure complete joint penetration upon subsequent welding from that side.

**4.** The fact that the completed columns, containing the completed welds, were examined by

plaintiff's employee in Pennsylvania before they were shipped does not bar recovery by plaintiff herein, in light of the following provision in the contract:

> Any inspection by Buyer does not relieve the Seller of its responsibility for correctness in fabrication, the quality, or workmanship in accordance with the specifications and/or drawings.

from the facts of this case because either (a) the defects were patent, or (b) where latent, the plaintiffs had delayed notice to the defendants for an unreasonable period after they had discovered the defects. The closest case on the facts and law cited or found is *Larrance Tank Corporation v. Burrough*, 476 P.2d 346 (Okl.1970), which dealt with defective welding not observable by the naked eye. The welding was in a gasoline tank which had been buried under several feet of dirt and, like the welding defect in our case, was not quickly discoverable. Notice to the defendant therein was given by the plaintiff promptly after discovery, fifteen months after acceptance. The court relied on UCC § 1–204(2) (quoted above herein), and stated that the defect "was not one that was quickly discoverable," and that it could not say as a matter of law that plaintiff's remedy was barred by § 2–607(3) because of plaintiff's failure to discover the defect earlier.

In the case at bar the defects in the welds were not visible to the naked eye. Upon consideration of all the facts, this court finds and concludes that plaintiff had no duty to discover the hidden defects in the welds before they were in fact discovered, and that plaintiff's claim is not barred by its failure to discover and give notice of the defects sooner than it did.

(b)

The second defense asserted by defendant to the first count is based on defendant's construction of section 6 of SWC, which was made a part of the contract between plaintiff and defendant, and on certain "facts" asserted by defendant which the court did not find to be supported by the evidence, which included the provisions of SWC and the Commentary thereon published by the American Welding Society, offered in evidence by defendant.

Defendant contends that under SWC, plaintiff had the duty, inter alia, to inspect the welds as they were being made and to discover any defects at that time; and that such failure bars recovery under count I. The court does not so find or hold, for two reasons:

(i) Section 6.1.3 of SWC requires that an "Inspector" be "notified in advance of the start of any welding operations." That was not done by defendant. Plaintiff's subcontract inspector, Lerp, received his first telephone call from defendant only after the welding on all the bayline columns had been done and the columns had been painted and loaded onto trucks. On his first visit to defendant's plant Lerp rejected the columns because one of the bars on each of the columns had only half of the welds called for by the drawings, and a "match bar" on the base plate of two of the columns had been welded in the wrong location. On each of Lerp's three visits, the welds had been painted over, and such defects in the welds as lack of root back–gouging were not visible.

(ii) Moreover, any claimed failure of Lerp in his inspections does not bar plaintiff from recovery herein. Defendant's argument ignores an explicit term of the contract between the parties, which provided as follows:

Any inspection by Buyer does not relieve the Seller of its responsibility for correctness in fabrication, the quality, or workmanship in accordance with the specifications and/or drawings.

The court finds and concludes that no action or failure to act on the part of plaintiff bars it from an award of appropriate damages.

The responsibility for adequate quality control during fabrication of the columns rested on the fabricator, the defendant herein. Section 6.6.3 of SWC states in pertinent part that "the contractor [in this case, the defendant] shall be responsible for visual examination and necessary correction of all welds...." The Commentary on SWC states in § 6.6, dealing with "Obligations of Contractor":

The contractor is responsible for his work; therefore quality control must be performed by his inspectors ... Inspection at appropriate stages is important to economy and efficiency of fabrication.

Since problems identified and corrected early in the work can save both time and money, welders, supervisors and inspectors should be alert to identify defects and potential defects during fabrication. Whatever inspection was done by defendant during the fabrication process was clearly inadequate.

■ One of the items listed in § 8.15.1 of SWC for which a contractor is responsible is "lack of fusion between weld and base metal;" that condition existed in almost all of defendant's welds. Therefore, the reasonable cost of these repairs must be paid by defendant.

## II

The second count of the complaint alleges a separate oral agreement after the defects in the welds were discovered, in which defendant agreed to pay plaintiff's cost of repairs. Defendant concedes that at a meeting on October 21, 1976, its vice president (Raker) stated that defendant would be willing to "participate" in the cost of replacing defendant's welds, but argues that no binding agreement was made.

The court has found that at the meeting on October 21, 1976, Reid, plaintiff's representative at the meeting, explained to Raker how the repair costs would be computed and allocated to defendant, i. e., that only actual labor and material costs would be charged against defendant, and that no overhead or profit would be charged to defendant. Raker did not object or specifically agree to the method by which defendant's participation would be calculated. A letter written by Raker to plaintiff on November 3, 1976, stated:

> In view of the seemingly critical nature of the welds in question, and even though we feel that our welding has substantially been "in accordance with the practices set forth by the American Welding Society", our customer relations with Koppers have always, in the past, been a pleasant and satisfactory one. As we wish to continue this relationship, we will agree to participate in the cost of rewelding the columns, bearing in mind that our total

purchase order for this work amounted merely to the sum of $56,050.00, and that, as stated by Mr. Reid during the discussions, the dollar value of our participation is negotiable.

Plaintiff introduced into evidence its copy of the letter, on which Reid had written the words "Not So" next to Raker's statement that the dollar value of defendant's participation was "negotiable." Reid's understanding at this time was that defendant would pay for the cost of the repairs of its welds, and that while the amount had not been fixed during the October 21 meeting, the method of calculating such amount had been agreed on.

■ The claimed agreement was made in Maryland, and the parties are agreed that Maryland law applies. That law is discussed at length in *Maryland Supreme Corp. v. Blake Co.*, 279 Md. 531, at 538–540, 369 A.2d 1017 (1977). The court finds and concludes that no binding agreement was entered into at the October 21 meeting.

## III

### *Damages*

The court has made elaborate findings of fact with respect to the expenditures made by plaintiff to correct the defects in defendant's welds.

Because the bayline columns in this case had been accepted by plaintiff for shipment to the job site, they were "accepted goods," within the meaning of UCC, and the following sections of that code apply:

> § 2–714. *Buyer's damages for breach in regard to accepted goods.*
>
> (1) Where the buyer has accepted goods and given notification (subsection (3) of § 2–607) he may recover as damages for any non–conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value

they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

§ 2–715. *Buyer's incidental and consequential damages.*

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; . . . ."

█ Plaintiff's expenditures were increased by the fact that the defects were not discovered until the columns had been installed in the precipitator and that much of the work was done at night. The costs were substantially larger than they would have been if plaintiff had caused the ultrasonic examination of the welds to have been made before the columns were installed in the precipitator. In section I of this opinion the court has found and concluded that plaintiff had no duty to discover the hidden defects in the welds before they were in fact discovered, and that plaintiff's claim is not barred by its failure to discover the defects sooner than it did. Nevertheless, there are facts and equities in this case which justify some reduction in plaintiff's total claim.

In the pretrial order plaintiff listed its damages as follows:

1. Labor and supervision . . . . . . . . $183,482.25
2. Equipment . . . . . . . . . . . . . . . . . 12,558.74
3. 2.2% West Virginia B & O Tax    4,312.90
4. Radiographic testing fees . . . . .   10,152.23

Plus interest and costs.

At the trial, plaintiff offered evidence of additional $30,800.85 for expendables and administrative costs not listed in the pretrial order. That evidence was admitted subject to exception. Plaintiff moved for a modification of the pretrial order to include those amounts. The court has some discretion in granting or refusing such amendment, see Rule 16, F.R.Civ.P.; Christiansen, The Pre–Trial Order, 29 F.R.D. 362, 371 (1962). The court concludes that under the facts of this case it should not exercise its discretion to include the $30,800.85 as damages in this case.

█ Plaintiff claims pre–judgment interest at the rate of 10% per annum, the average prime rate over the period, a total of over $55,000; at 6% per annum the figure would have been over $32,000. In diversity cases, questions involving the award of interest are generally to be determined under state law. *Klaxon Co. v. Stentor Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Plantation Key Developers, Inc. v. Colonial Mortgage Co.,* 589 F.2d 164 (5 Cir. 1979).

It has long been the law of Maryland that the recovery of interest in such a case as this "is a question entirely for the jury [or a judge sitting without a jury] to be decided according to the equities of the transaction." See *I. W. Berman Properties v. Porter Brothers, Inc.,* 276 Md. 1, 16, 344 A.2d 65, 75 (1975), and cases cited therein.

The court finds and concludes that the equities require the disallowance of plaintiff's claim for pre–judgment interest in this case.

The court finds and concludes that plaintiff is entitled to recover $210,506.12, the sum of the four items listed in its pretrial order.

Judgment will be entered for that amount.