NO. 95-2548

Dakota Gasification Company,      *
                                  *
          Appellant,              *
                                  *
     v.
     *  Appeal from the United States
                                  *  District Court for the
Pascoe Building Systems,
          *  District of North Dakota.
a division of Amcord, Inc.;       *
Del Con, Inc.,
          *
                                  *
          Appellees.              *


                    Submitted:  December 15, 1995

                      Filed:  August 1, 1996


Before McMILLIAN and BEAM, Circuit Judges, and PERRY,*
     District Judge


PERRY, District Judge.


     Dakota Gasification Company ("Dakota") appeals from the district
court's[1] order granting summary judgment in favor of Pascoe Building
Systems ("Pascoe").  The district court ruled that the economic loss
doctrine prevented Dakota from availing itself of tort remedies when
structural steel beams used in an oxygen plant provided on a "turnkey
basis" failed.  We affirm the district court's grant of summary judgment
in favor of Pascoe.

_____

     *The HONORABLE CATHERINE D. PERRY, United States District
     Judge for the Eastern District of Missouri, sitting by
     designation.

     [1]The Honorable Patrick A. Conmy, United States District
Judge for the District of North Dakota.

The facts involved in this case are substantially uncontested. In 1977, several pipeline companies formed the ANG Coal Gasification Company ("ANG"). ANG contracted with Kaiser Engineers, Inc., who in turn contracted with its wholly-owned subsidiary, Henry J. Kaiser Company ("Kaiser"), for construction of a federally guaranteed $2 billion synthetic natural gas production plant north of Beulah, North Dakota. The plant was to be one of the largest synthetic fuel plants in the world and the only one of its kind in the United States. The plans in part called for the construction of an air separation plant ("oxygen plant") to produce the oxygen which, along with coal and steam, was one of the raw materials used in the production of synthetic natural gas.

Kaiser subcontracted with Lotepro Corporation ("Lotepro") to provide the labor, material, and equipment needed to furnish ANG with a fully functioning oxygen plant on a turnkey basis. The oxygen plant was to produce the 3,100 tons of oxygen per day needed for the production of synthetic fuel. The contract, which had an effective date of April 29, 1981, provided that "Sub-Contractor hereby guarantees the Work against defects in material and workmanship . . . for a period of one (1) year after the date of acceptance . . . ."

In the same agreement, Lotepro subcontracted with Del Con, Inc., ("Del Con") to furnish the pre-engineered metal building that would enclose the oxygen plant. On February 16, 1982, Del Con entered into a "proposal and contract" with appellee Pascoe Building Systems to supply the structural steel for the 130' x 325' x 60' building, and Del Con agreed to pay Pascoe $382,974 in return. Section 16 of the Del Con/Pascoe contract provides:

> Seller warrants only that its products are free from defects in materials and workmanship on the date of shipment from its plant. Seller's obligation under this

warranty shall be limited to repairing or replacing (but not dismantling or installing) such products which prove to be thus defective within one (1) year from the date of the original shipment by Seller and which Seller's examination shall disclose to be thus defective.  Any products so repaired or replaced as provided herein shall be subject to warranty only for the remainder of the time applicable to the original warranty period.

. . . .

THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE OF THIS AGREEMENT, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, AND SELLER SHALL NOT BE RESPONSIBLE FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES (SUCH AS DAMAGES TO THE CONTENTS OR FURNISHINGS IN ANY BUILDINGS) OR ANY LOSS OF ANY KIND WHATSOEVER.

Pascoe shipped structural components such as steel rafters, columns, and purlins to the plant site during the summer of 1982.  During the construction process Kaiser and others conducted weld inspections and discovered defective welds on some of the Pascoe materials.  After negotiations among the various parties, Pascoe welded hundreds of steel plates over various deficient welds at its own expense to correct the problem.  Final inspection of the weld repairs was completed in March of 1983.  The oxygen plant was tested in 1984.  On June 5, 1985, after Kaiser inspected the plant on behalf of ANG and agreed that it met the specifications of the contract, Lotepro received a certificate of completion and acceptance from Kaiser.  The Lotepro warranty expired one year later.

In 1986, after ANG defaulted on construction loans guaranteed by the U.S. Government, the Department of Energy foreclosed and took possession of the entire synthetic fuel plant.  In an October 7, 1988, asset purchase agreement, the government sold the $3 billion plant to Dakota Gasification for less than $100 million and an agreement that Dakota would give up a certain percentage of the plant's profits.  Dakota's contract to purchase the plant stated

that the plant assets were being purchased "'AS IS, WHERE IS,' WITHOUT WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT WARRANTY AGAINST INFRINGEMENT, WARRANTY OF MERCHANTABILITY AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE."

On January 12, 1991, more than eight years after Pascoe had supplied its materials for construction of the oxygen plant, a part of the oxygen plant's roof collapsed under the weight of ice and snow, causing damage to various items within the plant. Although the collapse caused significant damage to property, it did not cause any personal injuries. The district court assumed that the collapse was caused by a faulty weld; the parties agree that this weld was not discovered during the 1983 repair of defective welds.

On July 22, 1992, Dakota and its insurance company, Industrial Risk Insurers ("IRI"), filed a complaint against Lotepro, Pascoe, Kaiser, Del Con, and others in the United States District Court for the District of North Dakota alleging negligence, strict liability, breaches of express and implied warranty, and parent and successor corporation liability. On May 17, 1995, the district court entered summary judgment against Dakota on all its claims. Dakota has settled its claims against Lotepro and is currently pursuing claims solely against Pascoe.

**II.**

We review the entry of summary judgment <u>de novo</u> under the same standard that governed the district court's decision. <u>Lenhardt v. Basic Inst. of Technology, Inc.</u>, 55 F.3d 377, 379 (8th Cir. 1995). The judgment will be affirmed if the record shows that there is no genuine issue of material fact and that the prevailing party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Maitland v. University of Minnesota</u>, 43 F.3d 357, 360 (8th Cir. 1994).

The district court held that the "economic loss doctrine" barred any tort claims, because the only physical damage was to the product itself and because Dakota, as the owner, was limited to its bargained-for warranty remedy.  Although appellant agrees that North Dakota law recognizes the economic loss doctrine, it argues that the North Dakota courts would not apply that doctrine in the instant case, because the contract here did not involve a "sale of goods" and because "other property" was damaged by the defective Pascoe product.

We must apply the law of North Dakota to this case.  Although the North Dakota Supreme Court adopted the economic loss doctrine in Cooperative Power Association v. Westinghouse Electric Corporation, 493 N.W.2d 661 (N.D. 1992), it has not answered the precise questions raised here.  The job of a federal court in such a situation is, of course, to attempt to ascertain how the state court would decide the issue.  We review such determinations by the trial court de novo.  See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991).

**A.**

Dakota first argues that no sale of goods under the Uniform Commercial Code was involved here, and that therefore the economic-loss doctrine cannot apply.  The Uniform Commercial Code states that "'[g]oods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ."  N.D. Cent. Code § 41-02-05(2) (1995); see also Robertson Cos., Inc. v. Kenner, 311 N.W.2d 194, 200 (N.D. 1981).  The structural components provided by Pascoe--steel columns, purlins, and rafters--constitute goods under the UCC, and the contract's repeated reference to the structural steel components as "products" supports this finding.  See Environmental Elements Corp. v. Mayer Pollock Steel Corp., 497 F. Supp. 58, 63 (D. Md. 1980) (treating fabricated columns as goods for purposes of

the UCC); Robertson, 311 N.W.2d at 194 (holding that the term "goods" should be construed broadly so as to carry out the underlying purpose of the UCC).

Dakota contends that Pascoe's subsequent weld repairs constituted a contract for services, and that its claim that Pascoe was negligent in performing these services is not governed by the UCC. Section 16 of the Del Con/Pascoe contract states that "Seller's obligation under this warranty shall be limited to repairing or replacing . . . such products which prove to be . . . defective within one (1) year from the date of the original shipment by Seller . . . ." Following discovery of the defective welds, Pascoe and the other parties established a protocol concerning the necessary repairs, and Pascoe completed the repairs at its own cost and in accordance with the preexisting contract. There was no separate contract for services.

> The Supreme Court of North Dakota has held that,
>
> [i]n contracts involving both a sale of goods and a rendition of services, if the predominant factor, the thrust, the purpose reasonably stated is the sale of the goods with the rendition of services incidentally involved, the contract is for a sale of goods and the Uniform Commercial Code is applicable . . . .

Robertson, 311 N.W.2d at 199; see also Air Heaters, Inc. v. Johnson Elec., Inc., 258 N.W.2d 649, 652 (N.D. 1977). We find that Pascoe's contractual agreement to repair defects discovered within one year of the date of sale, and Pascoe's subsequent compliance with this contractual provision, does not alter the fact that the "thrust" of the contract was the sale of goods. The Del Con/Pascoe contract therefore was a contract for the sale of goods, and the Uniform Commercial Code applies here.

**B.**

In _Cooperative Power Association v. Westinghouse Electric Corporation_, 493 N.W.2d 661, 666 (N.D. 1992), the North Dakota Supreme Court applied the economic loss doctrine to losses caused by a failure of a component of the product sold, concluding that "a manufacturer of a machine sold in a commercial transaction may not be held liable in negligence or strict liability for economic loss caused by a failure of a component part of the machine which causes damage to the machine only." The economic loss doctrine is based on the understanding that contract law, and the law of warranty in particular, is better suited for dealing with purely economic loss in the commercial arena than tort law, because it permits the parties to specify the terms of their bargain and to thereby protect themselves from commercial risk. The Supreme Court, in the seminal case of _East River S.S. Corp. v. Transamerica Delaval, Inc._, 476 U.S. 858 (1986), distinguished the policies undergirding tort law and contract law, and elaborated on contract law's goal of compensating a contractual party for injuries experienced due to a breach of a duty created in an express or implied contractual relationship. The Court noted the importance of preventing "contract law [from] drown[ing] in a sea of tort," _id._ at 866, and cautioned that "[p]ermitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. It would be difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product." _Id._ at 874.

In _Cooperative Power_, the purchaser of a transformer sued its manufacturer under theories of both negligence and strict tort liability. A bushing in the transformer had failed, causing damage only to the transformer itself. In explicitly adopting the _East River_ rationale, the North Dakota court reviewed the policy considerations stressed by _East River_:

(1) tort concerns with safety are reduced when a product damages only itself; (2) damage to only the product itself means the product has not met the customer's expectations and is most naturally understood as a warranty claim; (3) warranty law is well suited for commercial controversies, which generally do not involve large disparities in bargaining power, so the parties can contractually set the terms of their agreements and, within limits, disclaim warranties or limit remedies while allowing purchasers to obtain the benefit of their bargain; (4) warranty law has built-in limitations on liability based on privity and the requirement of foreseeability of consequential damages as a result of a breach, whereas tort law confers a duty to the public generally and permits recovery for all foreseeable claims, which could subject manufacturers to indefinite economic losses by a purchaser's customer; and (5) recovery under warranty law establishes a bright line for damages to the product itself and avoids the uncertainty inherent in any attempt by courts to limit purely economic damages in tort.

Id. at 664.

The trial court here determined that the economic loss doctrine applied for two reasons: first, because the damage was only to the property itself, that is, only to the oxygen plant and buildings constructed pursuant to the Lotepro/ANG turnkey contract; and second, because even if a factual dispute existed over whether the oxygen plant was a single product, the damages were only to the property of the buyer and were well within the contemplation of the parties to the contract. The trial court found that the North Dakota courts, if faced with this situation, would limit the property owner to warranty remedies. Because we agree with the second reason, we need not determine whether the oxygen plant itself was a single product.

## C.

Dakota argues that the economic loss doctrine cannot apply here because the damage was not merely to the Pascoe-supplied steel, but also to the building containing the steel and to the

oxygen plant and its equipment. Many of the economic loss cases, including Cooperative Power, state that the doctrine protects a commercial supplier from tort claims where there is no personal injury or damage to "other property." The rationale for this approach is that using the economic loss doctrine to prevent tort remedies for damage to other property or to third parties is inappropriate because such damage was not within the contemplation of the contracting parties and the parties therefore did not fairly bargain for this additional unforeseeable risk.

The trial court recognized that the modern trend in many jurisdictions holds that tort remedies are unavailable for property damage experienced by the owner where the damage was a foreseeable result of a defect at the time the parties contractually determined their respective exposure to risk, regardless whether the damage was to the "goods" themselves or to "other property." Although there is no North Dakota case directly on point, the reasoning used by the courts that have accepted this modern trend, along with the North Dakota Supreme Court's reasoning in Cooperative Power, lead us to conclude that the modern trend's approach is entirely consistent with North Dakota's prior treatment of the economic loss doctrine.

In Detroit Edison Co. v. NABCO, Inc., 35 F.3d 236 (6th Cir. 1994), for example, an electric utility brought a products liability action against a power plant pipe supplier. The court held that Michigan law barred the utility's tort action for damage to the plant following a pipe explosion. In so holding, the court emphasized that "the buyer may insist on additional warranties to cover such a contingency, or the buyer may decide to assume a greater degree of the risk of such failure in exchange for a lower purchase price from the seller." Id. at 240. The court concluded that it was foreseeable to the contracting parties that pipes conveying high-pressure steam could explode, and that such an event would do great damage to surrounding equipment. Because the damage

to surrounding property was therefore not "beyond [the buyer's] contemplation," the court held that the buyer's tort claims against the manufacturer of the pipe were barred by the economic loss doctrine. Id. at 242; see also Myrtle Beach Pipeline Corp. v. Emerson Elec. Co., 843 F. Supp. 1027, 1057-59 (D.S.C. 1993); Citizens Ins. Co. of America v. Procter & Schwartz, Inc., 802 F. Supp. 133, 140 (W.D. Mich. 1992); Hapka v. Paquin Farms, 458 N.W.2d 683, 688 (Minn. 1990).

In Neibarger v. Universal Cooperatives, Inc., 486 N.W.2d 612 (Mich. 1992), the Michigan Supreme Court reasoned that injury to the product itself cannot be completely divorced from possible injury to other property because poor performance will necessarily cause injury to other property in many instances. The North Dakota Supreme Court cited Neibarger in Cooperative Power without any criticism. Neibarger's and the other cases' reasoning is simply an extension of the principle recognized by the Supreme Court in East River that virtually all machines have component parts, and that to distinguish the component parts from the whole would result in a finding of injury to "other property" whenever a product injures itself. Similarly, it is difficult to imagine a scenario in which the natural consequence of an installed structural component's failure would be damage only to the structural component itself without any damage to the surrounding property. If such economic damage is a foreseeable consequence to the parties in a commercial relationship governed by the UCC, then it is a proper subject for negotiation and contract law, not for tort remedies. The modern trend's reasoning is therefore nothing more than a fairly subtle and very logical extension of the economic loss doctrine discussed in East River and adopted in Cooperative Power. Indeed, as the Sixth Circuit noted, many cases discussing the "other property" exception end up holding that the damage was only to the property itself. See Detroit Edison Co. v. NABCO, Inc., 35 F.3d at 240 n.2.

We agree with the trial court that this case is similar to Detroit Edison because the defective structural components caused great damage to surrounding property, but such damage was within the contemplation of the parties when they signed the contract. Del Con, like the purchaser in Detroit Edison, entered into the agreement after evaluating the risks and liabilities that potentially would follow if the materials failed to perform. The Del Con/Pascoe contract in fact specifically provided that "SELLER SHALL NOT BE RESPONSIBLE FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES (SUCH AS DAMAGES TO THE CONTENTS OR FURNISHINGS IN ANY BUILDING) OR ANY LOSS OF ANY KIND WHATSOEVER." This language demonstrates that the damage which occurred here was well within the contemplation of the parties.

A contrary holding would yield results that conflict with the economic loss doctrine's purpose, as recognized by the North Dakota Supreme Court in Cooperative Power. Allowing tort remedies in a case such as this would perversely encourage contractors to "bargain" for no warranty or insurance protection in exchange for a reduced purchase price, because they could rely on tort remedies as their "warranty." Such an outcome is plainly inconsistent with the values of commercial efficiency and predictability that drive the economic loss doctrine and that were praised in Cooperative Power.

Dakota presents us with no authority indicating that North Dakota has rejected this modern trend.[2] Although Dakota cites

---

[2]We note that Dakota's attempt to apply the asbestos cases of MDU Resources Group, 14 F.3d 1274 (8th Cir. 1994), and Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co., 984 F.2d 915 (8th Cir. 1993), to the case at hand fails because, as was noted in Tioga, these cases involve a "type of risk [not] normally allocated between the parties by agreement." Tioga, 984 F.2d at 919; see generally Christopher Scott D'Angelo, The Economic Loss Doctrine: Saving Contract Warranty Law from Drowning in a Sea of Torts, 26 U. TOL. L. REV. 591, 560 (1995). James L. Cannaughton, Comment, Recovery For Risk Comes of Age: Asbestos in Schools and the Duty to Abate a Latent Environmental Hazard, 83 NW. U. L. REV. 512, 529 (1989).

Cooperative Power's discussion of Vantage, Inc. v. Carrier Corp., 467 N.W.2d 446 (N.D. 1991), a case in which a furnace attached to a building caused a fire which damaged the building and its contents, that case is not particularly instructive here because the issue presented there was whether a claim was barred by the statute of limitations. The furnace in Vantage had been added at some undetermined time after the building was completed, but the opinion does not reveal exactly when the furnace was added, by whom it was installed, or who owned it. The North Dakota Supreme Court in Vantage was simply not presented with the issue here, and we will not follow Dakota's invitation to speculate as to whether the court implicitly rejected the modern trend in the economic loss cases, especially since Vantage was decided the year before Cooperative Power.

We therefore agree with the district court's prediction that the North Dakota Supreme Court would adopt the modern trend, and conclude that the economic loss doctrine extends to preclude liability in tort for physical damage to other nearby property of commercial purchasers who could foresee such risks at the time of purchase.

**III.**

In sum, we hold that because the damage to the oxygen plant from Pascoe's defective product was a harm that was reasonably foreseeable to the parties to this commercial transaction, contract law, and not tort law, must provide the remedy for this purely economic loss. We need not consider whether the district court correctly considered the oxygen plant to be a single product, because under North Dakota law the economic loss doctrine bars

-12-

Dakota's tort claims even if the oxygen plant was not a single product.

Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.