483 A.2d 88

USEMCO, INC.

v.

MARBRO COMPANY, INC.

No. 26, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Nov. 8, 1984.

352

Joseph P. Manck, Annapolis, for appellant.

Steven R. Migdal, Annapolis, with whom were Marvin L. Andersen and Manis, Wilkinson, Snider & Goldsborough, Chartered, Annapolis, on brief, for appellee.

Submitted Before WEANT, ALPERT and BLOOM, JJ.

BLOOM, Judge.

Appellant, USEMCO, Inc., sued appellee, Marbro Company, Inc., in the Circuit Court for Prince George's County, for money allegedly due as final payment for an automatic pumping station Marbro purchased from USEMCO for inclusion in a sewage treatment facility Marbro built for Anne Arundel County. Marbro pleaded a "set off and counterclaim" in which it acknowledged that it withheld the final payment but asserted that USEMCO was responsible for delays in completion of the facility that caused Marbro to be assessed liquidated damages by Anne Arundel County in a total amount greater than the $23,500 due USEMCO.

The case was removed to the Circuit Court for Anne Arundel County where, after a nonjury trial, USEMCO was determined to be liable for a substantial part of the liquidated damages sustained by Marbro. Appealing from a judgment in its favor for just $1750, USEMCO raises the following issues:

1) Did the lower court err in not accepting as controlling the Standard Terms and Conditions as part and parcel of this contract?

2) Did the lower court err in finding a breach of this contract, resulting from the alleged delay on the part of the appellant?

3) Did the lower court err in assessing damages against the appellant in this matter by using the liquidated damage clause of the contract between appellee and Anne Arundel County?

4) Did the lower court err in its analysis of the facts, and was the error instrumental in the court finding the way it did, thereby resulting in reversible error?

Our answer to each of those questions is "No," although with respect to the first three of them we take a somewhat different route than the trial court followed to reach the same destination.

### Facts

USEMCO is a manufacturer of pumping stations. Through its Maryland agent, Flow Industries, Inc. (Flow), USEMCO learned that Anne Arundel County was soliciting bids for the construction of sewage systems. Flow obtained for USEMCO a set of the county's plans and specifications, on the basis of which USEMCO prepared a proposal for Flow to transmit to Marbro and other general contractors interested in submitting bids to the county. As prepared by USEMCO, the pertinent portions of the document read as follows:

USEMCO proposes to offer for sale the equipment described below, subject to the Standard Terms and Condi-

tions of Sale contained in USEMCO's Order Acknowledgement Form.

USEMCO factory built automatic pumping station with a nominal initial design capacity [followed by detailed specifications and dimensions not necessary to repeat here]. The principal components shall include:

PUMPS: 2 rated at 2000 gpm. The pumps proposed are 8 inch, model $8 \times 8 \times 17$, manufactured by Allis Chalmers. Motors shall be supplied at 30 Hp, 860 rpm, to operate on 3 phase, 460 volts power.

CONTROL: NEMA I, Type Bubbler Flowmatcher.

PIPING: Suction 12 inch, Discharge 12 inch.

[Auxiliary equipment and specially required equipment were also listed.]

Price: _____ F.O.B. factory, freight allowed.

Delivery: 24–28 weeks estimated, after receipt of approved drawings.

Flow was instructed to price the proposal and send copies to Marbro and other interested contractors.

Based on USEMCO's proposal, Marbro submitted a bid to Anne Arundel County and sent to Flow, on Marbro's stationery, an order in the following form:

2 pump station
(200 GPM &
200 GPM
as per plans to specs)

1 Magnetometer &
Recorder
as per plans & Specs

[This order is contingent upon award, and equipment subject to approval by Anne Arundel County.]

Total     72,500.00

According to testimony adduced by it at trial and not contradicted by Marbro, USEMCO then sent to Marbro by mail an Order Acknowledgment form together with a three page document entitled "Standard Terms and Conditions of Sale."

USEMCO's Order Acknowledgment form thanked the customer for the order, acknowledged its receipt and advised that the order had been accepted and was "subject to our Standard Terms and Conditions, which are attached to our Order Acknowledgement." Included among the provisions printed on the Standard Terms and Conditions form were the following:

1. This proposal is based upon a design prepared by USEMCO which is similar to the quantities and/or specifications shown by the job plans. This proposal does not guarantee that the product described herein is in exact accord with the job plans.

\*     \*     \*     \*     \*     \*

3. USEMCO shall schedule delivery at the earliest possible date; all delivery schedules are estimates only, based on the best information available.

\*     \*     \*     \*     \*     \*

9. USEMCO shall not be liable for any losses, damages, or delays due to or caused by transportation difficulties, fire, labor shortages, strike or other labor disputes, civil or military authority insurrection, riot, war, accident, shortage of labor or material, failure of USEMCO to receive brand name parts or other materials necessary for the construction of this equipment, flood, storm, flotation of equipment, or any other cause or circumstance, whether like or unlike the foregoing, beyond USEMCO's reasonable control or for any delays due to failure of buyer to furnish and/or approve technical data, drawings, etc. Acceptance of equipment on delivery shall constitute a waiver of any claims for losses or damages due to delay, whether or not excused by the foregoing, and a waiver of the right to revoke such acceptance for any reason. Further, under no circumstances shall USEMCO be liable for any liquidated, special or consequential damages or for any penalties, whether direct or indirect.

The county's plans and specifications called for "built-together" pumps with wound rotor motors. Contending that

no company in the United States made wound rotor motor "built-together" pumps and relying upon an "equal or better" clause in the county's plans and specifications, USEMCO proposed to substitute what is known in the trade as "flex-coupled" pumps, which USEMCO insists are superior in performance to "built-together" pumps. Although the county does not appear to dispute USEMCO's opinion that "flex-coupled" pumps are equal to or better than "built-together" pumps in performance capabilities, it nevertheless rejected the substitution because "flex-coupled" pumps are so much larger in size than "built-together" pumps that in the limited confines of the pumping station they would be difficult and, therefore, costly to maintain. USEMCO then proposed to alleviate that problem by supplying additional machinery to lift the pumps out of the station for maintenance work, but the county felt that solution would not be practical because maintenance of the lifts would involve additional expense. Finally, USEMCO offered to provide maintenance for some extended period of time, but the county preferred to have all maintenance work done by its own employees who would be readily available in an emergency.

Unable to persuade the county to accept its "flex-coupled" pumps, USEMCO eventually arranged for the manufacture of what the county's plans and specifications called for—"built-together" pumps with wound rotor motors.

Marbro's contract with Anne Arundel County required completion of the entire system by October 10, 1977, 180 days after work was begun; and it provided for liquidated damages of $150 for each day beyond October 10 the contractor took to complete the project. The county granted Marbro an extension to November 24, 1977. The first set of USEMCO's drawings and submissions showing a "built-together" pump was delivered to the county on November 16 and approved by the county by November 29, 1977. USEMCO finally delivered the pumps and stations to the job site on February 10, 1978. Marbro had finished installing the sewer pipe lines by the end of the previous

summer and had to wait for delivery of the pumping station in order to complete the project, which involved construction of a building over the station, making pipe and electrical connections to the station and backfilling dirt. All of those activities, originally scheduled for early fall in 1977, were complicated by cold winter weather. Consequently, Marbro did not have the electrical work ready for the Baltimore Gas & Electric Company to supply current until April 18, 1978.

The project was completed and turned over to the county on June 21, 1978. Anne Arundel County assessed liquidated damages against Marbro in the amount of $31,500 for the 210 day period from November 24, 1977, to June 21, 1978.

The trial court found that USEMCO had breached its agreement with Marbro by failing to make timely delivery of the pumping station, thereby causing Marbro's failure to complete the project within the time allowed by its contract. The court determined, however, that USEMCO was responsible for the delay and consequent assessment of liquidated damages only from November 25, 1977, to April 18, 1978, when electricity was supplied and the equipment could be made operable. Accordingly, Marbro was allowed a setoff of $21,750, leaving a balance of $1750 due and owing to USEMCO. Judgment was therefore entered in that amount.

## I

Appellant's first and principal contention is that the trial court erred in not accepting as controlling the "Standard Terms and Conditions" as part of the contract between it and Marbro. Of course, if that document were included in the contract there would be no liability on the part of appellant because it absolved USEMCO of any liability for delay for liquidated damages. The court, however, ruled that the document had "no legal relevance to the case" because there was no evidence that Marbro received a copy

of the document prior to acceptance of the contract or that Marbro agreed to any of its terms.

Appellant's assertion of error is twofold. It argues first that there was uncontradicted testimony that the document was mailed to Marbro, thereby raising a presumption that the item " 'reached its destination at the regular time and was received by the person to whom it was addressed.' " *Border v. Grooms*, 267 Md. 100, 104, 297 A.2d 81 (1972), quoting from *Kolker v. Biggs*, 203 Md. 137, 144, 99 A.2d 743 (1953). That argument, although valid, is over a matter that was never in dispute. Marbro had not denied receiving a copy of USEMCO's "Standard Terms and Conditions," and the trial court's decision was not predicated upon a finding that the document was not mailed or received. The court concluded that the "Standard Terms and Conditions" form was not sent to Marbro until after the contract was formed; and since Marbro did not thereafter agree to those terms and conditions, they never became part of the contract.

That brings us to the second part of USEMCO's first contention. Its argument is based on the proposition that when a contract or writing refers to another document, that other document is to be interpreted as part of the writing. *Wheaton Triangle Lanes, Inc. v. Rinaldi*, 236 Md. 525, 531, 204 A.2d 537 (1964). Therefore, appellant contends, since its offer—the initial proposal—specifically stated that it was "subject to the Standard Terms and Conditions of Sale contained in USEMCO's Order Acknowledgement Form," those terms and conditions were part of the offer that Marbro accepted by submitting its order. Thus, appellant's argument continues, the contract, by its very terms, not only negated liability for liquidated damages, it also provided that Marbro's acceptance of the equipment on delivery would constitute a waiver of any claims for losses or damages due to delay.

Both parties as well as the trial court proceeded on the basic premise that USEMCO's initial proposal constituted

an offer to sell equipment, with certain terms of the sale to be contained in another document that did not accompany the offer, and that Marbro's order constituted an acceptance of USEMCO's offer. The question thus presented was whether the terms of sale contained in the separate document were part of the contract because, although undisclosed, they were referred to in the offer or whether they never became part of the contract because the offer was accepted before the additional terms were disclosed to the purchaser. The trial court took the latter position.

█ We begin with a somewhat different premise, since in our view USEMCO's initial proposal did not constitute an offer.

It is obvious that what was involved in this case was a sale of goods within the contemplation of Title 2 of the Maryland Uniform Commercial Code (hereinafter cited as UCC), Md.Com.Law Code Ann., §§ 2–101 through 2–725. As noted in *Maryland Supreme Corp. v. Blake Co.,* 279 Md. 531, 538, 369 A.2d 1017 (1977), the UCC does not define "offer" so with respect to that term we must look to the common law and the law merchant. UCC § 1–103.

An essential feature of every contract being the mutual assent of the parties, it is usually necessary for one of them to "propose to the other a promise which he will make for a certain consideration, or to state the consideration which he will give for a certain promise." 279 Md. at 539, 369 A.2d 1017.

An offer must be definite and certain. *Peoples Drug Store v. Fenton,* 191 Md. 489, 494, 62 A.2d 273 (1948). To be capable of being converted into a contract of sale by an acceptance, it must be made under circumstances evidencing an express or implied intention that its acceptance shall constitute a binding contract. Accordingly, a mere expression of intention to do an act is not an offer to do it, and a general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer. Thus, a

mere quotation or a statement of a price or prices and an invitation to enter into negotiations, are not offers which may be turned into binding contracts upon acceptance. Such proposals may be merely suggestions to induce offers by others. *See Williston* [*on Contracts* (3rd ed. Jaeger 1957) ], §§ 31–33; Am.Jur.2d, *Contracts* §§ 31–33 (1964); 67 Am.Jur.2d, *Sales* §§ 73–75 (1973). What this all boils down to is expressed in 17 Am.Jur.2d, *Contracts* § 33 (1964):

> From the nature of the subject, the question whether certain acts of conduct constitute a definite proposal upon which a binding contract may be predicated without any further action on the part of the person from whom it proceeds, or a mere preliminary step which is not susceptible, without further action by such party, of being converted into a binding contract, depends upon the nature of the particular acts or conduct in question and the circumstances attending the transaction. It is impossible to formulate a general principle or criterion for its determination.

*Id.* [279 Md.] at 539–540, 369 A.2d 1017.

USEMCO's initial proposal was clearly not sufficiently definite and certain to constitute an offer. True, it described the equipment and quoted a price; but since it specifically provided that any sale of that equipment at that price would be subject to terms and conditions to be disclosed later, the proposal was not capable of being converted into a contract of sale by an acceptance. Moreover, the proposal was couched in language that negated an intention that it be deemed an offer. It did not say, "USEMCO *offers* for sale" the described equipment; it said, "USEMCO *proposes to offer* for sale" the described equipment. Obviously, the initial proposal was nothing more than a quotation, an invitation to enter into negotiations, with further action on the part of USEMCO being required before it would be bound by contract.

■ Marbro's order, on the other hand, did constitute an offer to buy for $72,500 USEMCO's factory built pumping station and magnetometer meeting Anne Arundel County's plans and specifications (of which USEMCO was already aware) contingent upon Marbro being awarded the contract by the county and also contingent upon the county's approval of the equipment. We must now determine, therefore, whether USEMCO's acknowledgment that it had received the order and accepted it was an acceptance of Marbro's offer and, if so, what effect, if any, should be given to the "Standard Terms and Conditions" attached to or enclosed with the Order Acknowledgment form. The answers to those questions are contained in the Uniform Commercial Code.

UCC § 2–207, which governs this transaction, provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants [1] such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the

---

1. The transaction in the case *sub judice* was unquestionably "between merchants" as that term is defined in UCC § 2–104.

original contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of Titles 1 through 10 of this article.[2]

USEMCO's acceptance of Marbro's offer to purchase (order) did not expressly provide that it was "made conditional on assent to the additional terms," but it did state that it was "subject to" the Standard Terms and Conditions. If we treat the latter expression as equal to the former, then under § 2–207(1) there was no acceptance and thus no written contract, which brings § 2–207(3) into play; if the two expressions are not equivalent, the transaction is governed by § 2–207(2)(b) or (c). In our view, either approach leads to the same result.

If we were to conclude that the writings between the parties do not establish a contract because USEMCO's acceptance of Marbro's order was expressly conditional on the additional terms to which Marbro did not assent in writing, then under subsection (3) of § 2–207 the contract of sale established by conduct does not include the additional terms because the writings between the parties do not agree on them. On the other hand, if the "Standard Terms and Conditions" are to be construed merely as "proposals for additions to the contract," under § 2–207(2), then despite the fact that Marbro did not give notice of objection to them (§ 2–207(2)(c)), they did not become part of the contract because they materially alter the offer. § 2–207(2)(b).

The official comment to UCC § 2–207 furnishes examples of clauses which would "materially alter" the contract and so result in surprise or hardship if incorporated without *express* awareness by the other party, as well as examples

---

**2.** Subsection 3 of § 2–207 is consistent with § 2–204 which provides that a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties recognizing the existence of such contract, and which further provides that a contract for sale does not fail for indefiniteness even if terms are left open if the parties intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

of clauses which involve no element of unreasonable surprise and therefore are to be incorporated in the contract unless notice of objection is seasonably given. Included in the latter are clauses fixing a reasonable time for complaints within customary limits, providing for interest on overdue invoices or fixing the seller's standard credit terms when they are within the range of trade practice and do not limit any credit bargained for, limiting the right of rejection for defects which fall within customary trade tolerances for acceptance "with adjustment," or otherwise limiting remedy in a reasonable manner. Examples of the type of additions that would be considered material alterations include clauses negating standard warranties of merchantability or fitness for a particular purpose in situations in which such warranties would normally attach or clauses requiring that complaints be made in a time materially shorter than customary or reasonable.

Unless it would be both fair and commercially sound to assume that failure to object within a reasonable time to a proposal for additional terms is tantamount to an assent to their inclusion, we should not apply § 2–207(2)(c) to terms and conditions that go to the very heart of the bargain. Applying that test to the facts of this case, we conclude that USEMCO's "Standard Terms and Conditions," if considered to be proposals for addition to the contract would so materially alter the contract that they did not become part of it as a consequence of Marbro's failure to object to them.

Marbro needed and expressly ordered equipment that conformed to Anne Arundel County's plans and specifications; USEMCO's negation of any guarantee that its product would be in exact accord with the job plans was so inconsistent with the buyer's purpose that it would be unfair and unreasonable to assume from silence that Marbro assented to that provision. Marbro's contract with Anne Arundel County contained a deadline and provided for liquidated damages in the event of delay; the provisions in USEMCO's "Standard Terms and Conditions" absolving it from any liability for liquidated damages and providing that

Marbro's acceptance of equipment on delivery would constitute a waiver of any claim for losses or damages due to delay were so inconsistent with the buyer's obligations that it would be unfair and unreasonable to assume from Marbro's silence that it assented to those provisions.

Thus, regardless of the interpretation given to USEMCO's attempt to make the sale "subject to" its "Standard Terms and Conditions," those terms never became part of the contract between the parties.

## II

In support of its contention that the trial court erred in finding a breach of contract resulting from delay in delivery of the pumping station, appellant argues that it did all that was reasonably required of it considering no time for delivery was specified in the contract. We find no merit in that argument.

When there is no time for performance specified in the contract, a reasonable time will be inferred from all the facts and circumstances. *Anne Arundel County v. Crofton Corp.*, 286 Md. 666, 410 A.2d 228 (1980); *Evergreen Amusement Corporation v. Milstead*, 206 Md. 610, 112 A.2d 901 (1955).

There was evidence in the case, including testimony of USEMCO's manager and chief engineer and correspondence between Marbro and USEMCO's agent, Flow, from which the court could properly find, as it did, that USEMCO was aware of Marbro's deadline and the penalties it faced if it did not complete its project by that deadline. A reasonable time for performance, therefore, would be in such time as would enable Marbro, if it acted diligently, to meet its deadline, unless other factors would make that impractical.

USEMCO asserts that it delivered its pumping stations within a reasonable time after *its* plans and drawings were approved by the county. It points out that it promptly ordered all the materials it needed to fulfill the contract, looking to a September 1977 delivery date. It maintains

that it knew of no other firm that would make the "built-to-gether" pump with wound rotor motors specified by the county and insists that its "flex-coupled" pumps were superior and it had a right to assume that they would be acceptable under the "equal or better" clause in the county's plans and specifications. While that may have been a reasonable assumption originally, it ceased being reasonable after the county rejected the "flex-coupled" pumps because of perceived maintenance difficulties. Instead of promptly proceeding thereafter to construct the pumps and motors in accordance with the county's requirements, as it eventually did, appellant persisted in its attempts to persuade the county to accept the "flex-coupled" pumps.

Additionally, if USEMCO had promptly delivered the pumping station itself, without the pumps, while it was still trying to resolve the problem with the pumps, Marbro could have completed all of its work, including plumbing and electrical connections as well as building construction and grading, long before the pumps arrived. The system could have been made operable immediately after the pumps arrived, and the damages would have been considerably less. Instead, appellant refused to deliver the stations until its pumps were approved and then constructed.

The finding that appellant breached the contract by failing to deliver the equipment within a reasonable time was one of fact which, being supported by substantial evidence, was not clearly erroneous. It will not be disturbed. Md. Rule 1086.

### III

■ Appellant's third contention, that the trial court erred in awarding damages based on the liquidated damages assessed against Marbro, is predicated upon an argument that such damages were not foreseeable.

USEMCO asserts that it never knew of the specific terms of the contract between Marbro and Anne Arundel County. The court properly found otherwise. The county's contract

form, containing the liquidated damages clause (with a blank space to fill in the per diem amount), was included in the package of plans and specifications. The evidence clearly indicated that appellant's agent, Flow, had a set of the plans and specifications since it forwarded at least part of the plans to appellant. Knowledge of the agent is attributed to the principal. *Unsatisfied Claim & Judgment Fund Board v. Fortney*, 264 Md. 246, 285 A.2d 641 (1972).

USEMCO, therefore, is charged with pre-contract knowledge that Marbro would be assessed some amount of liquidated damages if it did not complete the project within a specified time. Obviously, it was foreseeable by USEMCO that if it unreasonably delayed performance of its contract Marbro would sustain *some* loss in the form of liquidated damages assessed by Anne Arundel County. It is not necessary that the exact amount of such damages be foreseeable.

## IV

Asserting that the trial court made a material mistake in its fact finding, appellant points to the following sentences in the trial judge's memorandum opinion:

> However, since electrical power was not available, the earliest that the pumps could be placed in actual operation was April 18, 1978. It was USEMCO's responsibility to supply electrical power to the site in this matter.

Appellant argues that this was a grave error since USEMCO had no responsibility to bring electrical power to the site. Consequently, it claims, the court improperly concluded that USEMCO was responsible for delays extending to April 18, instead of to February 10, 1978, thereby miscalculating the damages.

What appellant has seized on was obviously an inadvertent misstatement, a slip of the pen, rather than an error in fact finding. In another portion of his opinion, the trial judge clearly stated the basis of his decision. He expressly

found that USEMCO's equipment was delivered and available for operation on February 10, 1978; but from February to June, Marbro was hooking up electricity and performing other work to complete the project, which could not be done until USEMCO delivered the stations and pumps. Because that delivery occurred in the dead of winter, much of Marbro's work could not be done immediately. As a consequence, the pumps could not have been placed in operation prior to April 18, 1978. According to the evidence, that was the earliest date the stations were ready for the power company to supply electricity to them.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.