**LENKIN–N LIMITED PARTNERSHIP, et al., Appellants,**

v.

**Barry NACE, Appellee.**

No. 88–594.

District of Columbia Court of Appeals.

Argued Nov. 15, 1989.
Decided Jan. 5, 1990.

---

(Lenkin) constituted a breach of the lease agreement. Plaintiff-appellee brought suit in Superior Court contending that because of unreasonable delay by Lenkin in preparing the entire premises for occupancy, the firm was forced, for a period of several months, to pay the entire rent on office space that was only partially occupiable. Plaintiff sought damages amounting to that portion of the rent and electricity expenses attributable to the unoccupied portion of the office, which was the first floor. Lenkin defended on the ground that no unreasonable delay had occurred and that, pursuant to the terms of the lease, plaintiff was responsible for the entire amount of the rent even though construction on a portion of the premises was not yet completed when he moved in. The jury found for plaintiff and awarded damages of $6,316.

On appeal, Lenkin argues that plaintiff's failure to present expert testimony that any delay in "building out" this commercial office space was unreasonable rendered his evidence insufficient to create a jury issue, so that Lenkin's motion for a directed verdict should have been granted at the end of plaintiff's case.[2] For the reasons that follow, we agree and reverse.

Glenn M. Cooper, with whom David A. Slacter, Bethesda, Md., was on the brief, for appellants.

John J. Sellinger, Mercer, Pa., with whom Lynn S. Spradley, Washington, D.C., was on the brief, for appellee.

Before BELSON, STEADMAN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This case involves a dispute over whether a delay in completing construction of certain "raw" commercial space leased by the law firm of Paulson & Nace (PN)[1] from appellant Lenkin-N Limited Partnership

I

On July 5, 1985, PN and Lenkin signed a lease agreement to rent commercial office space located at 1814 N Street in Northwest Washington, D.C. At the time the lease was signed, the space was "raw"; that is, it was completely bare with concrete floors, no ceilings and no walls. It therefore had to be "built out" before it could be used.

Section 2 of the lease stated that the rental term would begin on one of three dates:

the *earlier* ... of the following: (a) the date tenant opens for business; or (b) the

---

1. Richard S. Paulson died prior to the initiation of this suit. Barry J. Nace (Nace) filed suit in the Superior Court and is the appellee here.

2. Lenkin also argues that certain evidence was improperly admitted at trial, including plain-

tiff's videotaped deposition. Since we conclude that the trial court erred in denying Lenkin's motion for a directed verdict, we do not reach these issues.

*later* of (1) October 1, 1985,[3] or (2) fifteen (15) days after tenant receives written notice from landlord that so much of the building standard work as is not dependent on prior installation or completion of special items ordered by or for tenants will have been substantially completed.... (Emphasis added.)

Under section 24 of the lease, Lenkin was required to supply and install all "building standard work" at its own expense. This included the work necessary to construct a standard office space such as walls, ceilings, doors, electrical and·telephone outlets, and heating and air conditioning. Any additional or more elaborate "special items" were PN's responsibility, for which they could hire Lenkin or subcontract elsewhere. In either case, PN acknowledged that

> the installation or completion of Special Items may take longer than would the installation or completion of Building Standard items, and may delay the installation or completion of Building Standard work to be done. Accordingly, Tenant ... [must] accept delivery ... even though the Landlord's Work may not have been completed by the Tenant Occupancy date as a result of delays occasioned by special items.

PN chose to hire Lenkin for a substantial portion of the special item work.

On July 16, 1985, PN hired Fran Spector, a professional space planner and interior designer, to design the interior office space. PN expressed a desire for a "traditional" type of office containing a substantial amount of custom woodwork or millwork and other special items that went beyond the building standard work provided by Lenkin.[4] Pursuant to PN's instructions and the terms of the lease, Spector prepared construction documents and sub-

mitted them to Lenkin for pricing on August 8, 1985. Lenkin, after contacting the necessary subcontractors, completed its first pricing proposal on August 30, 1985, and submitted it to Spector and PN for approval. After reviewing the proposal, PN decided to eliminate some of the special items in order to reduce costs. They returned it to Lenkin for revisions on September 4, 1985. Lenkin submitted a revised proposal on September 11[5] which was once again returned with changes. The third and final proposal was submitted to PN on September 16 and signed on the 23rd. The proposal noted that the millwork would require ten to twelve weeks of lead time and the carpeting six to eight weeks. Construction began on September 24.

On October 17, 1985, Lenkin gave notice that the portion of the building standard work not dependent on installation of special items ordered by PN would be substantially completed in 15 days. A final walkthrough was conducted on November 1. The parties agree that the space was not ready for occupancy as of that date. Since the special millwork required to complete the stairs between the first and second floors had not arrived, the stairs were unfinished. Many of the special light fixtures also had not arrived, which delayed installation of the ceilings. Spector testified, however, that as of November 1 Lenkin had substantially completed the standard work that was not dependent on the special items. .

PN moved into the second floor on November 25, 1985, and began paying rent as of that date.[6] The first floor was still unusable. By late January or early February of 1986, PN was able to occupy the entire premises.

---

3. PN's old lease expired on September 30, 1985, and the firm had expressed a desire to occupy the new premises by October 1.

4. Spector testified that after reviewing PN's requirements, she told plaintiff that the space could not be built by October 1.

5. Spector testified that PN's changes to the first proposal were extensive. The cost of the origi-

nal design totaled $138,000 above the costs of the standard items. In the revised proposal of September 11, this was reduced to $28,600.

6. PN had objected to paying the full rent as of November 1, and after discussion with Lenkin it was agreed that the lease would commence on November 25.

## II

Plaintiff's case rested essentially on his deposition testimony. In the deposition, he testified that he had expressed a desire to occupy the new space by October 1, 1985, and that Lenkin should not have taken until late January 1986 to complete construction. Plaintiff stated that when he visited the premises before September 23, 1985, no construction activity had begun. On cross-examination, however, he acknowledged that he had twice modified and returned the special item proposals submitted by Lenkin before the third proposal was accepted on September 23. Plaintiff also testified that the millwork should not have taken ten to twelve weeks of lead time, since there had been negotiations on the lease going back to May, and that the work should have been completed before January 1986. On cross-examination, however, he acknowledged that he did not know "how long millwork should take," stating that "I'm not in that area...." Plaintiff presented no expert testimony that the delay in interior construction of the office building was unreasonable.

## III

The trial court, in ruling on a defendant's motion for a directed verdict, must view the evidence in the light most favorable to the plaintiff, *Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C.1982), and the plaintiff must be accorded the full effect of every legitimate inference therefrom. *Mahallati v. Williams,* 479 A.2d 300, 304 (D.C.1984). Upon review, this court is guided by the same standard. *Ceco, supra,* 441 A.2d at 994. If the evidence is such that no reasonable person could find for the plaintiff, then the question should not be put before the jury. *Id.*

In denying Lenkin's motion for a directed verdict at the close of plaintiff's case, the trial court found that

there is some evidence of delay; that is to say, absence of work on the premises. There is some evidence of delay between presentation of ... specifications by Spector and response thereto by Lenkin. And evidence from the Plaintiff indicating the complete absence of any activity on the premises related to readying the premises for ... occupancy ... and possession.

And there was sufficient evidence, therefore, from which the jury could conclude that the work of the contract was not being prosecuted with reasonable diligence, because there was some evidence indicating that it was not being prosecuted, at least on the premises[,] at all.

Upon review of the record, we conclude that there was no evidence from which a rational juror could find by a preponderance of the evidence that the delay in construction was unreasonable.

At best, plaintiff's testimony established that there was some delay in beginning construction and in completing the millwork. There was no evidence, however, from which the jury could conclude that this delay was unreasonable. The burden was on the plaintiff to establish that the lease agreement had been breached. The agreement specified that the lease would commence either on October 1, 1985, or fifteen days after the building standard work not dependent on the special items had been substantially completed. It also noted that installation of special items could delay completion of the space and that PN was obligated to accept delivery even though the work had not been finished. The pricing proposal for the special items in turn noted that the millwork would require ten to twelve weeks of lead time and the carpeting six to eight weeks. Thus, the possibility of delay was anticipated by both parties and could not by itself constitute a breach. As the trial court pointed out, Lenkin could be found to have been in breach of the agreement only if this delay was unreasonable. *See Flack v. Laster,* 417 A.2d 393, 400 (D.C.1980) (where no time is specified for performance, the law implies a reasonable time); *USEMCO Inc., v. Marbro Co., Inc.,* 60 Md.App. 351, 364, 483 A.2d 88, 95 (1984) (same).

The fatal defect in plaintiff's case was its failure to adduce any evidence by experts in commercial office construction about the reasonableness of the delay. This court

has held that "when the subject dealt with is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman, its clarification calls for the use of expert testimony." *District of Columbia v. Davis,* 386 A.2d 1195, 1200 (D.C.1978) (quoting *Waggaman v. Forstmann,* 217 A.2d 310, 311 (D.C.1966)). Unless a matter is "within the realm of common knowledge and everyday experience," *District of Columbia v. White,* 442 A.2d 159, 164 (D.C.1982) (quoting *Matthews v. District of Columbia,* 387 A.2d 731, 734–35 (D.C.1978)), jurors cannot be expected to reach an informed decision without the aid of such testimony.

In the present case, the jury was asked to determine whether a "build-out" of commercial office space had been completed within a reasonable time. The answer to that question in turn depended on resolving subsidiary issues of fact that lay jurors could not reasonably answer on the basis of everyday experience. To start with, it was conceded that no building standard work had begun until agreement was reached on the proposed special item work in late September. This delay, in fact, was a primary reason the trial court submitted the issue of unreasonable delay to the jury. Plaintiff, however, offered no evidence that permitted the jury to find that this delay was inconsistent with standard construction practice and hence unreasonable.[7] There was likewise no expert testimony on the causal relation, if any, between that delay and the time needed to install the special item millwork once it was ordered and received. Assuming the standard work could have begun earlier, would it have facilitated eventual installation of the special item work? Further, Spector testified that a portion of the delay was caused by the millwork manufacturer (chosen by Lenkin), but there was no testimony enabling the jury to gauge the reasonableness of that delay. Finally, although the

jury knew that Lenkin's pricing proposal for the millwork estimated a lead time of ten to twelve weeks for completion (suggesting completion in mid- to late December), the jury received no guidance on whether that time frame could be viewed as an industry standard of reasonableness for millwork of the kind ordered, or whether the additional month or more actually needed was reasonable by normal construction practice. Without expert instruction on these (and possibly other) issues, the jury was left essentially to speculate on whether the overall delay in completion of the building was reasonable.

In *District of Columbia v. Freeman,* 477 A.2d 713 (D.C.1984), this court reversed a judgment in a personal injury case because of failure to adduce expert testimony on an issue that, while factually dissimilar, is conceptually not different from the issue of delay in this case in requiring expert illumination. A 6–year–old boy had been injured when he was struck by a car while in a crosswalk. At trial his mother alleged, *inter alia,* that the District of Columbia had been negligent in failing to install a traffic signal instead of or in addition to the crosswalk. On appeal from a jury verdict against it, the District, pointing to the absence of expert testimony on whether the intersection was unreasonably dangerous, contended that the evidence was insufficient to allow submission of the case to the jury. This court agreed, holding that "whether a painted crosswalk is sufficient to render a particular intersection reasonably safe is a determination essentially technical in nature" requiring expert testimony "from engineers, designers, or highway safety experts [who could] plac[e] [the] evidence in an appropriate context for the jury." *Id.* at 719. We held the testimony of several lay witnesses, with firsthand knowledge of the intersection, that the intersection was unsafe insuffi-

---

7. Ironically, when counsel for Lenkin asked PN's interior designer Spector, "Until there's a final signed proposal by Mr. Nace saying exactly what he wants, is it appropriate for the contractor to begin constructing the space?," counsel for Nace objected unsuccessfully, stating, "This witness doesn't know what's appropriate for the

contractor." The only testimony on what was "appropriate", however, came later from witnesses for Lenkin, who stated that no work could have begun on the standard work until the special items were agreed upon, "because the special work is interwoven into the building standard work."

cient to create a jury issue. While "laymen ... may cross the street regularly, [they do not] possess the technical knowledge needed to judge the city's decision to install a crosswalk instead of a stop sign, light, or crossing guard at a particular intersection." *Id.* at 719–20.

If anything, the reasonableness of time needed to complete a commercial office build-out is farther from the realm of common experience than whether a painted crosswalk affords pedestrians a reasonable degree of safety in comparison to a traffic light. The appropriate timetables for ordering and installing building standard materials and special items are not within the ken of the average layperson.[8] Plaintiff was, of course, entitled to the benefit of every logical inference from the evidence he adduced, but "the courts of this jurisdiction have emphasized the distinction between logical deduction and mere conjecture," *District of Columbia v. Davis, supra,* 386 A.2d at 1201. Without expert testimony on the reasonableness of the construction delay, the jury's finding that Lenkin breached the agreement rested on supposition and nothing more. We conclude that the trial court should have granted Lenkin's motion for a directed verdict at the end of plaintiff's case.

*Reversed.*

---

**8.** It is true that in *District of Columbia v. Savoy Constr. Co.,* 515 A.2d 698, 708 n. 12 (D.C.1986), we rejected a claim by the District government that the plaintiff, a construction company which had sued the District for payment on a construction contract, was required to elicit expert testimony to aid the jury in deciding whether the District had breached the agreement by providing contract drawings and specifications containing dimensional errors. We did so, however, because "[m]uch of the testimony at trial came from persons *with considerable training and experience in construction matters* who also had firsthand knowledge of the facts in dispute here." *Id.* (emphasis added). There was, in other words, in *Savoy* the functional equivalent of expert testimony. Plaintiff offered no such testimony by persons with "training and experience in construction matters."