937 F.2d 603
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SMITH & LOVELESS, INCORPORATED, Plaintiff-Appellee,
v.
MAITLAND BROTHERS COMPANY, Defendant-Appellant.
SMITH 7 LOVELESS, INCORPORATED, Plaintiff-Appellant,
v.
MAITLAND BROTHERS COMPANY, Defendant-Appellee.
 Nos. 90-2144, 90-2145.
 United States Court of Appeals, Fourth Circuit.
 Argued March 7, 1991.
Decided July 11, 1991.
As Amended Aug. 13, 1991 and Aug. 26, 1991.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. John R. Hargrove, District Judge. (CA-87-2735-HAR)
 Edward J. McCormick, III, McCormick & Maitland, Norfolk, Mass. (Argued), for appellant; Tamar E. Levy, McCormick & Maitland, Norfolk, Mass., on brief.
 Charles Allen Hobbs, Hobbs, Straus, Dean & Wilder, Washington, D.C. (Argued), for appellee; Marsha Kostura, Hobbs, Straus, Dean & Wilder, Washington, D.C., on brief.
 D.Md.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and JANE A. RESTANI, Judge, United States Court of International Trade, sitting by designation.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Smith and Loveless, Inc. (S & L), a manufacturer and supplier of sewage treatment plants, brought suit against Maitland Brothers Company for the cost of a plant that S & L supplied to Maitland. Maitland filed a counterclaim charging S & L with faulty construction and workmanship. Determining which documents in the "battle of the forms" comprised the contract between the parties, the district court granted partial summary judgment in favor of S & L on its contract claim, holding that S & L's performance did not need to meet Navy specifications that were included in Maitland's forms and awarding S & L the unpaid contract price, contractual interest, and attorney's fees. It held a bench trial on Maitland's counterclaim and found in favor of Maitland on its claim for defective painting work and in favor of S & L on all other aspects of the counterclaim. The court also denied S & L's motion for an additional award of attorney's fees and interest covering the period between entry of partial summary judgment and the entry of final judgment. Both parties appealed, challenging the district court's findings on the terms of the contract, various evidentiary rulings, and the court's award of attorney's fees and interest.
 
 
 2
 We affirm the rulings of the district court on all issues except its ruling denying S & L's motion for contractual interest. Although the district court included contractual interest in its partial summary judgment, it erroneously failed to include interest for the period between the date of its partial summary judgment and the date of final judgment. We remand for the sole purpose of making that additional award.
 
 I. BACKGROUND
 
 3
 In 1984, Maitland Brothers Company contracted with the United States Navy to construct a sewage treatment plant at St. Inigoes, Maryland. Maitland invited bids from various subcontractors, including S & L, to supply the plant. S & L responded to the invitation with a proposed Sales Agreement in which it proposed to sell and install one of its standard sewage treatment plants, the Model 41R45 (or Model R), and an accompanying filter. The proposed Sales Agreement also listed related items and services that were to be included. On the back of each page of the Sales Agreement appeared S & L's boilerplate contract terms and conditions, including a provision for payment by the purchaser of interest at 1.7% per month on overdue bills and collection costs, if necessary, including reasonable attorney's fees.
 
 
 4
 On March 28, 1985, Maitland decided to procure S & L's Model R and issued a purchase order to S & L for its purchase and installation. Along with the purchase order, which was sent to S & L for acceptance and signature, Maitland sent its form "Sub-contract Agreement." The purchase order referred to the Navy specifications, which were included in the initial invitation to bid.
 
 
 5
 Because the Model R was a standard, "off-the-shelf" product and S & L was unwilling to absorb the cost of changes that the Navy might require, S & L acknowledged Maitland's purchase order with "exceptions and clarifications" as contained in a letter dated April 26, 1985, but it did not sign the Maitland purchase order or subcontract agreement. The April 26 letter stated that the equipment would be supplied pursuant to S & L's submittal data and not in accordance with the original plans and specifications provided by Maitland in the invitation to bid. The letter also stated, "We ... must impose delinquency charges of 1.7% per month on delinquent balances." The letter provided a signature line for an endorsement by Maitland under the heading "ACCEPTED AND AGREED TO." Without further exception, Maitland (by Robert Hall, a Vice President) signed the S & L letter of April 26 and returned it to S & L.
 
 
 6
 S & L thereafter forwarded proposed submittals (post-contractual documents containing detailed plans and specifications) on the Model R treatment plant to Maitland for approval and Maitland, in turn, forwarded them to the Navy for approval. The Navy twice returned the submittals to Maitland because they failed to comply with Navy specifications. On each occasion that Maitland returned rejected submittals to S & L, S & L made some modifications and resubmitted them to Maitland.
 
 
 7
 On September 5, 1985, notwithstanding the fact that the Navy had not yet finally approved S & L's submittals, Gary Maitland, Maitland's project manager for the St. Inigoes project, directed S & L to release the plant for manufacture in accordance with the last submittals agreed to by S & L. Gary Maitland advised S & L that new submittals would not be necessary. He admitted that he released the plant from manufacture on "our own responsibility." Relying on Gary Maitland's instructions, S & L released the plant from manufacture in accordance with the specifications set forth in the submittals as they stood when approved by Gary Maitland.
 
 
 8
 After S & L fabricated the plant and installed it at the site at St. Inigoes, Maryland, the Navy rejected the system because it deviated from the Navy's specifications. Although the Navy ultimately waived some of its specified requirements, it insisted that other requirements be complied with. Maitland made those modifications and the Navy accepted the plant in November 1986.
 
 
 9
 Prior to the Navy's acceptance, Maitland engineers noted workmanship problems with some welding, painting, and grouting. The welding and painting problems were relatively minor, and S & L claims it was willing to correct them if notified to proceed. Maitland never so notified S & L, but made the corrections itself.
 
 
 10
 When Maitland tested the large metal tank by filling it with water, some damp spots appeared on the concrete pad at the base of the tank, indicating leaks in the grout around the tank. Although grout had been supplied by S & L for that purpose, Maitland, who did the grouting, did not use that grout. To correct the leaks, Maitland chipped out all the grout and replaced it with epoxy. When the tank continued to leak, S & L was consulted and gave Maitland successful advice on how to correct the leakage. Maitland included the grout problem in its claims against S & L.
 
 
 11
 Because of the workmanship problems and the expenses of conforming the contract to Navy specifications, Maitland withheld one-half of the contract price as back charges.
 
 
 12
 The contract provided that Maitland would pay S & L the total sum of $184,599 for the plant and installation, 90% of which was payable within 30 days after delivery of material to the site, and the balance within 90 days. By July 11, 1986 the total amount of $184,599 became due and owing, and by August 11, 1986, contractual interest began running at 1.7% per month. Over two months later, on October 27, 1986, Maitland paid S & L one-half of the invoice price and withheld the remainder. S & L's suit demanded the balance, contractual interest, and attorney's fees.
 
 
 13
 Following S & L's two motions for summary judgment, one on liability and one on damages, on May 22, 1989, the district court awarded S & L $206,249.44, which included contractual interest up to May 22, 1989, and attorney's fees. It deferred for trial the set-offs alleged in Maitland's counterclaim. The court also dismissed Maitland's counterclaim insofar as it related to S & L's failure to meet Navy specifications because it concluded that the contract did not require S & L to conform to Navy specifications.
 
 
 14
 After a two-day bench trial on Maitland's workmanship counterclaims, the court awarded Maitland damages of $1,091.11 for defective painting work and rejected all other claims. Final judgment was entered in favor of S & L and against Maitland on April 25, 1990, when the court ruled on the counterclaims.
 
 II. MAITLAND'S APPEAL
 
 15
 The district court entered partial summary judgment for S & L on January 9, 1989, finding that the April 26, 1985 letter was the controlling contractual document and that this letter relaxed any requirement that S & L comply with Navy specifications. Maitland contends that the intent of the parties was otherwise and that S & L had, by agreeing to Maitland's purchase order, also agreed to Maitland's "Sub-contract Agreement" which refers to the Navy's specifications. To support this position, Maitland submitted a copy of the March 28, 1985 "Sub-contract Agreement" that it had submitted with its purchase order and an affidavit of Gary Maitland in which he stated that he never informed S & L that it was released from complying with Navy specifications and never authorized anyone else to do so.
 
 
 16
 The Gary Maitland affidavit, submitted in opposition to S & L's motion for summary judgment, did not create a genuine issue of material fact, because it was Robert Hall, not Gary Maitland, who signed the April 26th letter for Maitland, and no one contends that Hall's act was ultra vires. Moreover, the Sub-contract Agreement, on which Maitland relies, had never been signed by S & L. The identity and authenticity of the documents involved in the various exchanges by the parties and the fact that a binding contract was reached by the parties were also not disputed. Maitland's argument was directed to the legal construction of the documents.
 
 
 17
 Any analysis undertaken to discover the agreement that resulted from the exchange of conflicting forms must begin with an examination of the acceptances made to open offers. Although the common law interpreted an acceptance that did not "mirror" the offer as a counter-offer which rejected the offer, see White & Summers, Uniform Commercial Code 24 (1972), the Uniform Commercial Code (U.C.C.) attempts to adapt these principles more flexibly to the realities of the market, where merchants conduct business under arrangements reached by purchase orders and acknowledgements that do not often match. See U.C.C. Secs. 2-206 and 2-207, Md.Com.Law Code Ann. Secs. 2-206 and 2-207 (1985 & Supp.1990). See also Usemco, Inc. v. Marbro Company, 60 Md.App. 351, 361 (Md.App.1984).
 
 
 18
 Under the U.C.C., the offer is construed to invite an acceptance which is less than the rigid mirror response of the offer as long as it is "reasonable in the circumstances." U.C.C. Sec. 2-201(1)(a). Similarly, an acceptance that states additional or different terms than that in the offer does not automatically reject the offer. The additional terms of the acceptance can, in designated circumstances, become part of the contract unless the offer directs otherwise, the offeror objects, or the different terms materially alter the terms of the offer. See U.C.C. 2-207. The U.C.C., in attempting to formalize the sometimes loose contracting methods that result from the battle of the forms, even recognizes an enforceable contract when the parties conduct themselves as if they had reached a contract--even though the documents suggest otherwise. See U.C.C. 2-207(3). In that circumstance, the U.C.C. salvages the terms on which the conflict ing forms agree and incorporates supplementary terms agreed to by the parties thereafter.
 
 
 19
 Against these principles we examine the exchanges between the parties here.
 
 
 20
 The opening communication issued from Maitland in October, 1984, was an invitation to bidders to supply a sewage treatment facility at St. Inigoes, Maryland to become part of the Navy facility there. That invitation included Navy specifications. No one in this case contends that this invitation was an offer which could be accepted to form a contract. It was not a document which called for an acceptance. See Usemco, 60 Md.App. at 361. Rather it was an invitation to make an offer.
 
 
 21
 S & L's three page document entitled "Sales Agreement" which offered to provide a Model R sewage treatment plant and a Model DDR-30 filtration unit, was an offer which, if accepted, would form a contract between the parties. This proposed "Sales Agreement" of S & L described specific items offered for sale and the labor that was included. However, it made no reference to Navy specifications.
 
 
 22
 When Maitland issued its purchase order several months later, on March 28, 1985, to buy the sewage treatment plant from S & L, it again referred to the Navy specifications. Since this term materially altered the Sales Agreement, the term was a proposal for addition to the contract which could become part of the contract only if accepted by S & L. See U.C.C. Sec. 2-207(2)(b).
 
 
 23
 The differences between the parties, created by the differences in the Sales Agreement of S & L and the purchase order of Maitland, were apparently resolved by a letter sent by S & L on April 26, 1985. In that letter S & L accepted Maitland's purchase order "subject to the following clarification and modification," the important one providing:
 
 
 24
 While we [S & L] agree to conform the equipment furnished to your plans and specifications, we must require that responsibility for any variations will be governed by our submittal data as approved by the approving authorities, rather than by the original plans and specifications [provided by Maitland in the invitation to bid].
 
 
 25
 This letter of S & L was accepted and agreed to by Maitland without further alternation or exception. It therefore became the basis of a binding agreement between the parties.
 
 
 26
 Maitland argues that the intent of the parties should be examined because it did not intend to waive the requirement of conforming to the Navy's specifications. The district court, however, determined the language of the contract was clear and unambiguous. As the district court stated:
 
 
 27
 It is undisputed that the plaintiff's letter of April 26, 1985 was "accepted and agreed to" by the defendant ... This counter-offer, once accepted, effectively altered the initial requirement that the plaintiff comply with Navy specifications."
 
 
 28
 Where the language of a contract is clear, the test of what it means is not what the parties subjectively intended, but what a reasonable person would believe it meant. Board of Trustees v. Sherman, 280 Md. 373 (1977). Even if the intent of the parties, beyond that revealed by the contractual documents, were to be examined, the course of conduct between the parties would reveal Maitland's intent to absorb the cost of conforming S & L's commitment with Navy specifications. After the exchange of documentation giving rise to the contract, Gary Maitland instructed S & L to start the manufacture of the plant on "our [Maitland's] own responsibility," even though the Navy had not approved the pending submittal. This undertaking affirms that which was agreed to in the April 26 letter, that "responsibility for any variations will be governed by our submittal data as approved by the approving authorities, rather than by the original plans and specifications." The district court did not err in holding Maitland to this undertaking.
 
 
 29
 Maitland has also argued that S & L was not entitled to an award of attorney's fees, relying on its argument that S & L's Sales Agreement had not been agreed upon. Since we have concluded that the partial summary judgment properly determined that the terms of the agreement included S & L's Sales Agreement, Maitland is bound by the terms of S & L's form to pay reasonable attorney's fees in the collection of past due amounts.
 
 
 30
 Finally, Maitland complains of numerous evidentiary rulings made by the district court during the bench trail on the defective-workmanship counterclaims. It contends that the court erroneously excluded otherwise admissible hearsay when it permitted S & L's corporate representative, William R. Woods, to testify only from personal knowledge. Maitland attempted to question Woods regarding S & L's knowledge of leakage problems with the grout and S & L's presence at the start-up of the plant. Maitland argued that Fed.R.Evid. 801(d)(2)(A) permits a witness to make party admissions as to statements that employees might have made to Woods. However, Woods testified that his knowledge of these matters was not gained from S & L employees but rather from representatives of Maitland. Therefore the district court properly ruled that Maitland was not entitled to rely on this hearsay as S & L admissions.
 
 
 31
 Maitland also argues that the trial judge became overly involved in the examinations of witnesses by raising objections when S & L's counsel did not object and by permitting S & L's counsel to question witnesses on some subjects but not permitting Maitland's counsel to do the same.
 
 
 32
 Because this was a non-jury trial, there is a higher threshold for establishing prejudice from evidentiary errors. See Goodman v. Highlands Insurance Company, 607 F.2d 665, 668 (5th Cir.1979); Northwestern National Casualty Company v. Global Moving & Storage Inc., 533 F.2d 320, 324 (6th Cir.1976). Judges are afforded greater latitude in non-jury trials because they are presumed competent to recognize and disregard improper or otherwise prejudicial evidence. The issue is whether the improper admissions or exclusions induced the court to make a finding that it otherwise would not have made. See Kane v. Commissioner of Internal Revenue, 460 F.2d 1243 (5th Cir.1972).
 
 
 33
 Nothing has been brought to our attention that would show this prejudice. The district court's April 1990 memorandum opinion demonstrates that Maitland's counterclaim failed mostly because Maitland failed to prove damages. In these circumstances we conclude that if there was error, it was harmless and had no demonstrable affect on the court's ruling.
 
 III. S & L'S CROSS-APPEAL
 
 34
 S & L contends that the district court erred in refusing to award it attorney's fees for defending Maitland's counter-claim and in refusing to award contractual interest for the period between May 22, 1989 (when it entered partial summary judgment) and the date of final judgment. The district court denied attorney's fees for defending Maitland's claim because the defense did "not directly involve the collection of the contract debt," as provided by the applicable provision of the Sales Agreement.
 
 
 35
 When the counterclaim was tried, all claims based on the contract had been resolved. Maitland's counterclaim was a separable tort claim for negligent manufacture and faulty workmanship and just as well could have been tried separately had there been no issue on the contract amount. Under these circumstances, S & L would have had to defend the tort claim and no argument could have been made that the defense related to the collection of a contract debt. The issue of whether S & L's efforts in defending the counterclaim related to the collection of a contract debt is at most arguable, and on this basis we will not disturb the district court's finding that these efforts were not related.
 
 
 36
 When the district court entered partial summary judgment on May 22, 1989, it awarded S & L contractual interest at 1.7% per month on overdue bills for the period that ended with the entry of the partial summary judgment. At the end of the trial, S & L requested that this interest be extended for the period between May 22, 1989 (when the partial summary judgment was entered) and the entry of final judgment. The court refused, ruling that S & L was not entitled to the full amount of interest because the offsetting award on the counterclaim reduced the principal. When S & L recomputed the interest amount and moved to amend the judgment to allow the corrected interest, the court again refused, stating that its order of May 22, 1989 was a final order and that the contract interest rate terminated at that time.
 
 
 37
 Because Maitland's counterclaim remained an open matter on May 22, 1989, the partial summary judgment entered on that date was not a final judgment. See Fed.R.Civ.Pro. 54(b). Because the court improperly rejected the recomputation of contractual interest to the date of judgment, we remand this case for that limited purpose. In all other respects the judgment is affirmed.
 
 
 38
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.
 
 
 39
 MURNAGHAN, Circuit Judge, and JANE A. RESTANI, Judge, joined.